**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| HILDENE CAPITAL MANAGEMENT, LLC, on behalf of itself and all others similarly situated | Index No.  22-cv-1929 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| -against- | **DEMAND FOR JURY TRIAL** |
| AMERICAN BANKERS ASSOCIATION, FACTSET RESEARCH SYSTEMS INC., and S&P GLOBAL, INC., | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

NATURE OF ACTION ...................................................................................................1

PARTIES ......................................................................................................................10

JURISDICTION AND VENUE ....................................................................................11

RELEVANT MARKET.................................................................................................12

INTERSTATE TRADE AND COMMERCE ...............................................................12

FACTUAL ALLEGATIONS ........................................................................................13

ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT…………………………...28

DAMAGES…………………………………………………………………………30

CLASS ACTION ALLEGATIONS .............................................................................30

PLAINTIFF'S FAIR USE OF CUSIPS........................................................................35

CAUSES OF ACTION .................................................................................................36

FIRST CAUSE OF ACTION (Violations of Section 1 of the Sherman Act – Conspiracy to Restrain Trade) (Against All Defendants) ........................................................................................36

SECOND CAUSE OF ACTION (Violations of Section 2 of the Sherman Act – Monopolization) (Against Defendant S&P) ..........................................................................................37

THIRD CAUSE OF ACTION (Violations of Section 2 of the Sherman Act – Conspiracy to Monopolize) (Against All Defendants) ..............................................................................38

FOURTH CAUSE OF ACTION (Violations of the New York General Business Law § 349(a)) (Against All Defendants)...............................................................................39

FIFTH CAUSE OF ACTION (Violations of the Connecticut Unfair Trade Practices Act § 42-110b(a)) (Against All Defendants) .................................................................41

SIXTH CAUSE OF ACTION (Breach of Contract) (Against Defendant S&P).........................42

SEVENTH CAUSE OF ACTION (Injunctive Relief) (Against All Defendants).......................43

EIGTH CAUSE OF ACTION (Declaratory Judgment, 22 U.S.C. § 2201, Fair Use) ..........44

PRAYER FOR RELIEF ...............................................................................................46

JURY TRIAL DEMANDED.........................................................................................47

i

Plaintiff Hildene Capital Management, LLC ("Plaintiff" or "Hildene"), individually and on behalf of itself and all others similarly situated (the "Class"), bring this class action based upon personal knowledge of its own acts and upon information and belief as to all other matters alleged, including the investigation of Plaintiff's counsel, against Defendants the American Bankers Association ("ABA"), FactSet Research Systems Inc. ("FactSet"), and S&P Global Inc. ("S&P" and collectively, "Defendants") for violations of Section 1 of the Sherman Act, violations of Section 2 of the Sherman Act, violations of New York General Business Law § 349(a), violations of Connecticut Unfair Trade Practices Act § 42-110b(a), breach of contract, and injunctive relief. Hildene, on its own behalf, also brings this action for a declaratory judgment that Hildene's use of CUSIPs is a "fair use" that does not infringe on any purported intellectual property rights of Defendants over CUSIPs.

## NATURE OF ACTION

1.      CUSIPs are strings of numbers and letters that identify financial instruments. CUSIPs identify financial instruments just as social security numbers identify persons, or license plates identify cars. Just as social security and license plate numbers play an important public function of identifying people and vehicles, CUSIPs serve the public function of identifying individual financial instruments. Data concerning individual financial instruments is largely useless if unattached to a unique identifier like CUSIPs; the data become like baseball statistics unattached to specific players' names.

2.      The ABA asserts intellectual property rights to the CUSIP system.[1] CUSIP Global

---

[1] The CUSIP system primarily consists of CUSIP identifiers along with certain other identifiers, such as CGS International Securities Identification Numbers ("CGS ISINs") for international securities identification codes. References herein to CUSIPs refer to CUSIPs and the other securities identifiers that are covered by the subscription agreements entered into by members of the Class as defined and discussed below.

Services ("CGS"), a division of S&P's wholly owned subsidiary until March 1, 2022, has the exclusive right to license CUSIPs. S&P owned, operated, and managed CGS on behalf of the ABA since the creation of CUSIPs until it transferred CGS to FactSet for $1.925 billion through an asset sale agreement on March 1, 2022.[2] FactSet now owns, operates, and manages CGS. As described more fully below, CUSIP is the designated standard for identifying financial instruments in the United States. This exclusive standard, which has been entrenched in the market for decades, gave S&P, and now FactSet, monopoly power in the financial-instruments identification market.

3.      This action arises from S&P's abuse of its monopoly power in the financial instruments identification market, and Defendants' conspiracy to maintain S&P's (and now FactSet's) monopoly power and unreasonably restrain trade in the financial instruments identification market, in order to extract artificially inflated payments from investors and other users of financial data through subscription agreements to access CUSIP numbers. Plaintiff, like other members of the Class, receive no financial data services from Defendants; but rather obtain financial data from other sources that necessarily include CUSIP numbers. Defendants can hold up Plaintiff and members of the Class to pay prices unilaterally determined by Defendants not because there is anything special or valuable about the string of numbers and letters they generate, but simply because CUSIPs have been designated as the standard.

4.      Additionally, Defendants have conspired to prevent competition from, and the implementation of, alternative free, or far more cost-friendly financial instruments identifiers of equal or superior efficiency and quality. The motive for their exclusion of competition is simple: CUSIPs are worthless except for the fact that they are the standard.

---

[2] Upon information and belief, FactSet intends to step into the shoes of S&P to continue its anticompetitive, unfair, and deceptive practices alleged herein and has joined the other Defendants' ongoing conspiracy. Allegations concerning Defendants herein include FactSet with respect to its actions starting on or about March 1, 2022.

5.     Defendants extract these subscription fees through unfair, deceptive, and threatening business practices throughout the United States, including by threatening to cut off investors' access to data, typically provided by third parties (such as Bloomberg), that is essential to the continuation of investors' businesses. Additionally, S&P, through its CGS division, breached its commitment to the Accredited Standards Committee X9 ("X9") to offer market participants, such as Hildene and members of the Class, fair, reasonable, and non-discriminatory ("FRAND") pricing for CUSIPs.

6.     Defendants conspired to maintain and perpetuate S&P's financial instruments identifier monopoly and unreasonably restrain trade to collect substantial and unreasonable licensing fees (shared by S&P and ABA)—unconnected to the value of any particular CUSIP. Indeed, they can only charge these fees due to S&P's monopoly power by virtue of CUSIP being the standard.

7.     CUSIP is not the United States' financial instruments identifier standard because of any special technology or knowledge by S&P or ABA. After all, a CUSIP is just a string of numbers and letters. S&P is not uniquely capable of issuing and maintaining alphanumeric strings. Indeed, an able competitor, the Financial Instrument Global Identifier ("FIGI"), tried to replace CUSIP with its own free product capable of performing all the functions that CUSIP performs. Thus, CUSIP is the financial instruments identifier standard simply because Defendants conspired to ensure CUSIP remains the standard, even in the face of a free, equally good, and viable alternative from FIGI.

8.     CUSIP is designated as the standard for financial instruments identifiers by X9, which is a committee of the American National Standards Institute ("ANSI"). X9 most recently re-designated CUSIP as the national standard for financial instrument identification in December

2020. X9, however, is far from an independent standard-setting committee. The ABA itself established X9 in the 1970s and X9 remained part of the ABA until 2001. X9 remains closely tied to the ABA to this day. Both the ABA and S&P's CGS division are full voting members of X9, and the Chair of X9's Policy & Procedures, Tab Stewart, is a senior executive at the ABA and a member of the Board of Trustees at S&P's CGS division.

9.      For decades, the ABA designated CUSIP, for which it claims to own the intellectual property rights, as the standard for financial instruments identifiers, thereby embedding it into the framework of the securities industry today. ABA and S&P's CGS division jointly use their significant control over X9 to ensure CUSIP remains the financial instruments identifier standard. When a competitor attempts to introduce a new standard, including a free product like FIGI's identification system, Defendants act together to exclude the new product to protect S&P's monopoly and exert their influence over X9 to ensure CUSIP remains the standard for financial instruments identifiers. And, because CUSIPs are the one and only standard, S&P (and now FactSet) is free to extract licensing fees, which are shared with ABA, from data users at virtually any amount absent competition.

10.     As often occurs when a product becomes a standard, S&P through CGS committed to FRAND pricing for the use of CUSIPs during the standard setting process. The CGS License Fee Policy, which is available on the CGS website, claims that CGS charges "fair, reasonable and non-discriminatory license fees…." One of the reasons products designated as, or incorporated into, standards are required to be offered at FRAND pricing is to prevent "hold ups" where parties who have monopoly power by virtue of being the standard overcharge users by threatening to withhold access to the standard.

11.     S&P generates revenue for licensing the right to CUSIPs which it shares with the

ABA in at least three ways. First, S&P charges securities issuers a fee, typically about $280 per CUSIP number, to obtain CUSIP numbers for its securities. Second, S&P charges data providers, like Bloomberg, licensing fees for using CUSIPs in its databases ("Data Providers"). Third, and more recently, S&P demands that Data Providers' end users, like Hildene, or entities that otherwise download CUSIP numbers as part of financial data for their own use ("Data Users"), enter their own subscription agreements with S&P under the threat of stripping the CUSIP numbers from their data feeds if the unilaterally determined licensing fee is not paid. This third practice is the subject of this action. Defendants have a clear interest in requiring that all Data Users use only the CUSIP identifier system. That is because, upon information and belief, the ABA retains 30% of CGS's licensing fees from all Data Users and the remainder is kept by S&P (and now FactSet).

12.     S&P claims that through its CGS division it provides administrative services to Data Users to justify these fees. However, Data Providers (like Bloomberg), not Defendants, provide these administrative services to Data Users. Defendants already receive fees for CUSIP numbers twice: first from issuers of securities, and then from the Data Providers. Defendants' extraction of fees for a third time from Data Users merely because they download financial data that necessarily includes CUSIPs, does not constitute compensation for administrative services. Rather, they are demands for payments for a valueless alphanumeric string as part of hold ups monetizing the monopoly power held by virtue of being the standard.

13.     Hildene provides an example of how Defendants' scheme works. Hildene is a diversified institutional asset manager specializing in assets based on credit opportunities. As part of Hildene's asset management business it requires access to financial information concerning various financial instruments in connection with managing, monitoring, buying and selling financial instruments. Hildene, like many market participants, pays Bloomberg for terminals to

access the Bloomberg data service.[3] Bloomberg data concerning United States financial instruments necessarily includes CUSIP numbers since they are the sole identifiers for financial instruments, such as securities, in the United States.

14.     Hildene, like members of the Class, was subject to S&P's demands that it sign a form subscription agreement requiring, among other things, significant subscription payment amounts (which in Hildene's case is $10,500 annually) under the threat of stripping CUSIP numbers from the users' data feed. Hildene and the members of the Class are then left with two unenviable options: (i) pay S&P's supracompetitive subscription rates or (ii) have CUSIP numbers stripped from their data feed and suffer, at a minimum, significant disruption to their businesses. When Hildene balked at paying these licensing fees, S&P sent a series of increasingly hostile letters, and eventually constant threats that Hildene must pay the unilaterally set fee or face a debilitating lock out from access to CUSIP numbers. Hildene, with no legitimate business alternative, like other members of the Class, eventually signed the subscription agreement.

15.     Hildene brings this action on behalf of itself and similarly situated Data Users to stop: S&P's (and now FactSet's) abuse of its monopoly power in the relevant market and Defendants' conspiracy to maintain and abuse that monopoly power to unreasonably restrain trade; S&P's violation of its FRAND commitment; and Defendants' use of unfair and deceptive business and trade practices to extract money from Data Users who download data that contain CUSIP identifiers. Further, Hildene seeks a declaratory judgment that its download and use of financial data that contain CUSIP identifiers do not infringe the ABA's or any other Defendant's purported

---

[3] A Bloomberg terminal provides Data Users like Hildene a comprehensive service, including access to real-time market data, research, news, analytics, and execution capabilities, which also contains financial instruments identifiers like CUSIP. On the other hand, a customer of S&P's (and now FactSet's) CGS receives access to its databases containing certain financial instruments identifiers and related information. Thus, Bloomberg provides far more comprehensive data and CGS's and Bloomberg's data services are not interchangeable.

intellectual property rights to CUSIP numbers. There is nothing original, unique, or special about CUSIP numbers; they are trivial except for the fact they are the standard for identifying financial instruments. Hildene's use of the CUSIP numbers is both necessary and fair because CUSIPs are the designated standard.

16. **Violations of Section 1 of the Sherman Act**. For years, including throughout the Class Period, Defendants conspired to restrain trade in the financial instruments identifiers market to extort supracompetitive fees from Data Users like Hildene. Through the acts, practices and conduct alleged herein, Defendants have agreed to use their control of the standard-setting process and acted in concert to unreasonably restrain trade in the financial instruments identifiers market to (i) charge artificially inflated, arbitrary licensing fees resulting from CUSIP being the standard and not any intrinsic value in a random string of numbers and letters; (ii) influence X9 to select CUSIP as the standard; and (iii) exclude FIGI and other potential competitors from the market for financial instruments identifiers, thereby further entrenching S&P's monopoly and denying Plaintiff and members of the Class access to competitors' services and products, including a free alternative product. S&P and ABA's agreement to act together to exclude competition remained in place for five decades, preventing any competitor from penetrating the market no matter how much better or how free their product was for consumers. S&P exited this agreement this month only because regulators forced it to do so.[4] S&P's exit was lucrative: it sold CGS to FactSet for almost two billion dollars. Accordingly, Hildene, individually and on behalf of all persons and entities similarly situated, brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.* seeking actual damages, treble damages, and injunctive relief.

---

[4] The European Commission's ("EU") antitrust regulatory authorities required S&P to divest its CUSIP business in order for the EU to grant S&P and IHS Markit conditional Phase 1 approval of their $44 billion merger.

17.    **Violations of Section 2 of the Sherman Act**. For years, including throughout the Class Period, S&P abused its monopoly and market power and S&P and ABA conspired to maintain and perpetuate that monopoly to extort fees from Data Users like Hildene. Through the acts, practices, and conduct alleged herein, Defendants have used the standard-setting process to willfully and unlawfully maintain S&P's monopoly in the financial instruments identifiers market to (i) charge artificially inflated, arbitrary licensing fees resulting from CUSIP being the standard and not because of any intrinsic value in CUSIP's random string of numbers and letters; and (ii) exclude FIGI and other potential competitors from the market for financial instruments identifiers, thereby further entrenching S&P's monopoly and denying Plaintiff and members of the Class access to a competitors' services and products, including a free alternative product. Accordingly, Hildene, individually and on behalf of all persons and entities similarly situated, brings this action under Section 2 of the Sherman Act, 15 U.S.C. § 2, *et seq.* seeking actual damages, and treble damages, and injunctive relief.

18.    **Unfair, Deceptive and Threatening Business Practices**. Hildene, individually and on behalf of all persons and entities similarly situated, also brings this action under the laws of the states of New York (Section 349 of the New York General Business Law) and Connecticut (Section 42-110b of the Connecticut Unfair Trade Practices Act) seeking compensation for injuries caused by Defendants' use of materially unfair, deceptive, and threatening business practices to extract payment of artificially inflated and arbitrary licensing fees in subscription agreements. Specifically, Defendants have engaged in (i) purposeful and deceitful monopolistic conduct to ensure CUSIP remains the financial instruments identifiers standard; (ii) purposeful, deceitful, unfair, and discriminatory practices by extracting unfair and artificially inflated licensing fees; and (iii) making threats that Data Users will be unable to access essential data from Data

8

Providers absent meeting Defendants' demands to enter subscription agreements with S&P's CGS division. Hildene, and all persons and entities similarly situated, were thereby injured while doing business and entering transactions with CGS because of Defendants' unfair, deceptive, and threatening conduct therein.

19.      **Breach of Contract**. S&P, though its CGS division, agreed that, as a condition to X9 designating CUSIP as the financial instruments identifiers standard, S&P would license such rights to the CUSIP database on FRAND terms. Plaintiff, and each potential licensee of the CUSIP database, were intended third-party beneficiaries of the agreement between S&P and X9. S&P breached that agreement by not licensing the right to access the CUSIP database or CUSIPs numbers in the database on FRAND terms. Plaintiff and the members of the Class have been injured and suffered damages through the payment of fees that are not fair, reasonable, and non-discriminatory as a result of S&P's breach of its commitment to license access to the database on FRAND terms.

20.      **Injunctive Relief**. Plaintiff and the Class seek injunctive relief to correct the anticompetitive effect caused by Defendants' unlawful conduct as alleged herein. Defendants' conduct threatens to continue to injure Plaintiff and members of the Class. Plaintiff and the Class seek a permanent injunction prohibiting Defendants from continuing their illegal conspiracy and abuse of S&P's (and now FactSet's) monopoly power by charging Data Users fees for downloading data containing CUSIPs and ordering them to take appropriate remedial action to correct and eliminate any remaining effects of the conspiracy.

21.      **"Fair Use" Declaratory Judgment**. Plaintiff also seeks a declaratory judgment on behalf of itself that its use of CUSIP identifiers does not infringe on the ABA's or any other Defendant's purported intellectual property rights over them because such use of the CUSIP

numbers should be deemed a "fair use" under 17 U.S.C. § 107.[5] The use of CUSIP identifiers serves the important role of providing critical financial information to investors, analysts, and other participants in financial  markets not because of anything special about CUSIPs, but rather because they are the industry standard. Plaintiff does not collect any revenue as a direct result of its download or use of CUSIP identifiers, and any commercial gain is incidental to such use. The ABA's purported copyright over the CUSIP numbers themselves is thin as it covers purely factual information (*i.e.*, strings of numbers and letters) that identify specific financial instruments, no different than a license plate serves to identify a vehicle someone else produced. The CUSIPs are trivial and nothing more than a random string of letters and numbers. Anyone can generate random numbers and letters in a string. Plaintiff's use of CUSIPs is also reasonable and fair as its use is proportional to the need to accurately identify specific financial instruments in connection with its analysis, purchase, sale, and monitoring of such securities.

22.     A declaratory judgment on the fair use of CUSIP numbers is ripe for review now especially since, as described herein, Defendants have repeatedly threatened legal action and other business harm to Hildene unless it entered a subscription agreement with S&P's CGS division and pays an annual fee of over ten thousand dollars on an ongoing basis, which can be unilaterally increased by Defendants. A declaratory judgment will help resolve the legal issues in dispute and will relieve each party of the uncertainty and controversy that gives rise to this proceeding.

## **PARTIES**

23.     Plaintiff Hildene Capital Management, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 333 Ludlow Street, Suite 5, Stamford, Connecticut 06902-6691.

---

[5] In a February 2, 2010, letter to the SEC, the ABA stated that the "ABA retains the copyright in the selection and arrangement of data compiled in the [CUSIP] data base as well as in the CUSIP numbers themselves."

24.     Defendant ABA is a trade association based in Washington, D.C., organized under Section 501(c)(6) of the Internal Revenue Code, with its headquarters at 1120 Connecticut Avenue NW, Washington D.C. 20036.

25.     Defendant FactSet is an entity organized under the laws of the state of Delaware with its principal place of business at 45 Glover Avenue, Norwalk, Connecticut 06850. Defendant FactSet now owns CGS as a result of its asset sale agreement with S&P on March 1, 2022.

26.     Defendant S&P is an entity organized under the laws of the state of New York with its principal place of business at 55 Water Street, New York, New York 10041. CGS was a division of S&P's wholly owned subsidiary until S&P's sale of CGS to FactSet on March 1, 2022.

## JURISDICTION AND VENUE

27.     The claims set forth herein arise under Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, respectively. Plaintiff seeks actual and treble damages and equitable relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

28.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1338, and pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22.

29.     The Court has supplemental jurisdiction over the state and common law claims asserted herein pursuant to 28 U.S.C. § 1367 because these claims form part of the same case or controversy as the federal claims asserted herein.

30.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, and 28 U.S.C. §§ 1391 and 1400. Defendants are located in, licensed to do business in, or conduct business in this District, and a substantial part of the events or occurrences giving rise to the claims alleged occurred in this District.

31.     Personal jurisdiction over each Defendant is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1400, because each Defendant resides in, is found in, or transacts business in this District.

## RELEVANT MARKET

32.     The relevant product market is the market for financial instruments identifiers and numbering systems that identify any United States listed financial instrument, including securities or other issues for financial transactions and products, and the distribution of such identifying information through data feeds ("Financial Instruments Identifiers").

33.     The relevant geographic market is the Financial Instruments Identifiers market in the United States of America. S&P (and now FactSet as of March 1, 2022) controls the market for Financial Instruments Identifiers in the United States as a result of CUSIP being the exclusive standard. S&P's (and now FactSet's) control of the Financial Instruments Identifiers market is what necessitates the agreement to FRAND pricing.

## INTERSTATE TRADE AND COMMERCE

34.     Throughout the Class Period, Defendants collected fees through subscription agreements through the uninterrupted flow of transactions in interstate commerce throughout the United States, including within this District. Defendants' unlawful activities that are the subject of this Complaint were within the flow of, and have had a direct and substantial effect on, interstate trade and commerce.

## FACTUAL ALLEGATIONS

**I.      The Development of CUSIP and Creation of a Monopoly**

**A.      The Origin of the CUSIP System**

35.      The "Paperwork Crisis in the Securities Industry," which arose from the bull-market of the 1960s, created the initial need to create a standard method for identifying financial instruments, such as securities. At that time, the United States securities industry was drowning in paperwork and Wall Street was unable to properly trade given the crushing volumes of books and records. Brokers had to deliver rapidly increasing numbers of physical stock certificates to an institution's custodial bank instead of simply holding the certificates in their own vaults or sending them out directly to individual stockholders. As a result, many transactions remained unsettled every day due to delivery failures, delays, errors, or lost security certificates.

36.      Due to the magnitude of the problems associated with reliance on paper in securities transactions, the financial community began to consider developing a standard practice for identifying financial instruments, such as securities. Market participants decided that a system that could give each financial instrument a unique identifier linked to transaction data in a machine-readable format for ease of reference was needed. In 1962, the New York Clearing House Association, a private organization created to simplify the settlement of interbank transactions, established a Securities Procedures Committee to address the technical issues associated with using paper in large volumes of securities transactions.

37.      In recognition of the need for clarity and organization in the identification of financial instruments in the marketplace, the New York Clearing House Association approached the ABA to develop a uniform identification system based on assigning a unique identification

13

number to all stocks and registered bonds. In January 1967, the ABA's Committee on Uniform Securities Procedures ("CUSIP") announced the development of such a numbering system.

38.     The CUSIP identifier system was developed to assign a unique, alphanumeric number to a financial instrument. The system uses nine characters: the first six characters uniquely identify the issuer, the next two characters identify the issue, and the last character is a "check digit" for accuracy control. At inception, CUSIP numbers were imprinted on a machine-readable punch card, a new form of stock certificate for all transfers and depository book-entry deliveries. By 1970, the financial community endorsed and adopted rules requiring that certificates delivered by banknote companies have CUSIP numbers imprinted on them. The era of imprinting numbers on punch cards is long over. In today's digital age, assigning alphanumeric numbers is simple and can be largely automated.

### B.     ABA and S&P Coordinate to Entrench the Monopoly and Profit from CUSIPs

39.     Shortly after the ABA announced the development of the CUSIP identifier system, it created the CUSIP Service Bureau ("CSB"), the predecessor of CGS, to administer the CUSIP database. Later that same year, the ABA selected S&P, which agreed to operate and manage CSB/CGS as one of its divisions. This setup lasted through March 1, 2022, when S&P sold CGS to FactSet.

40.     The ABA asserts proprietary rights over CUSIP identifiers and grants an exclusive license to S&P's (and now FactSet's) CGS division. S&P (and now FactSet) willfully maintains its monopoly over Financial Instruments Identifiers, and Defendants conspire together to perpetuate that monopoly and unreasonably restrain trade in the market.

41.     Defendants profit from the fact that CUSIP is the sole designated standard for Financial Instruments Identifiers—not any intrinsic value in the random string of letters and numbers—in at least three ways: (i) charging securities issuers fees for assigning CUSIPs to

14

financial instruments; (ii) subscription agreements with Data Providers; and (iii) subscription agreements with Data Users. Upon information and belief, S&P (and now FactSet) shares 30% of its fees from Data Users' subscription agreements—ranging from $10,000 to hundreds of thousands annually—with the ABA. In short, S&P charges every party in the chain a license fee for using the same CUSIP, repeatedly cashing in on the fact that CUSIP is the standard. The value of S&P's monopoly power and ability to capture hold up fees by virtue of being the exclusive standard is evidenced by S&P's sale of CGS to FactSet for almost two billion dollars.

      **C.**    **ABA Creates X9 to Entrench CUSIP into the Infrastructure of the Financial Industry and Solidify the Monopoly**

42.      After granting an exclusive license to S&P's CGS, the ABA established the X9 Standards Committee in 1974, the predecessor of X9. In that same year, the X9 Standards Committee obtained approval from the ANSI to set CUSIP as the market standard for Financial Instruments Identifiers. In 1976, the ABA-controlled X9 Standards Committee ratified the CUSIP system as the national standard under ANSI X9.

43.      The X9 Standards Committee operated under the auspices of the ABA from its formation until 2001 when it formally separated from the ABA—but did not sever its close ties to the ABA—and changed its name to X9. The X9 Standards Committee, and then X9, rubber-stamped CUSIP as the national standard for each five-year re-accreditation period since 1976 without exception.

44.      Once a standard-setting organization like X9 adopts a particular product to be the market standard, competition within that market is eliminated and market participants are forced to use or adopt the standard. Thus, standardization can confer monopoly power on the product designated as or required by the standard. As a result, here, the adoption of CUSIP as the industry

standard entrenched CUSIP as the sole Financial Instruments Identifier in the United States and conferred on S&P monopoly power in the Financial Instruments Identifiers market.

45.     To further entrench CUSIP into the infrastructure of the financial industry, Defendants initially allowed market participants to access CUSIP identifiers without requirement that they pay licensing fees. However, after firmly entrenching CUSIP as the standard, according to a joint letter sent to the SEC by the Bond Dealers of America ("BDA"), the Investment Adviser Association ("IAA"), and the Government Finance Officers Association of the United States ("GFOA"),[6] as early as 2010, "S&P [began] contacting investment advisers, bond dealers, and representatives of many financial institutions seeking to collect significant licensing fees for the use of CUSIP regardless of the source or use of such numbers."

### D.     S&P Maintains Monopoly Power Over the Financial Instruments Identifiers Market and Defendants Conspire to Maintain It Through the Present Day

46.     Although X9 formally separated from the ABA in 2001, the ABA still exerts substantial control over it as there are significant ties and overlap between the ABA, S&P's CGS, and X9. The current managing global head of CGS is Scott Preiss, who previously chaired X9. The ABA's Senior Vice President, Tab Stewart, is the current chair of X9's Policy & Procedures Committee, a representative of X9's CUSIP Working Group—the working group responsible for reviewing and approving CUSIP as a national standard—and on CGS's Board of Trustees. Karin Flynn is the Chief Financial Officer of the ABA and also sits on CGS's Board of Trustees. Nine of the twenty-three members of the CUSIP Working Group were from the ABA and S&P's CGS when CUSIP's X9 accreditation was renewed in December 2020.

---

[6] These organizations include numerous members, such as McGuireWoods, RBC Capital Markets, Tradeweb, Inc., UBS Wealth Management, U.S. Bank National Association, Wells Fargo Securities, Allianz Global Investors, The Blackstone Group, BNY Mellon Investment Adviser, Inc., Charles Schwab Investment Management, LLC, Fidelity Institutional Asset Management, Franklin Advisers, J.P. Morgan Investment Management, PIMCO, Morgan Stanley Investment Management, Inc., and Vanguard Group.

47.     The CUSIP identification system was last approved by X9 as the national standard on December 22, 2020, maintaining CUSIP's 45-year history as the Financial Instruments Identifiers standard. This recent process was a renewal of CUSIP's five-year accreditation. Thus, CUSIP continues to enjoy a dominant, monopoly position in the Financial Instruments Identifiers market. As discussed below in Section II.C, Defendants conspired to prevent free, open-source systems such as FIGI from gaining traction in the Financial Instruments Identifiers market.

48.     Although CUSIP identifiers were initially developed to address transparency and efficiency issues in securities markets, Defendants now use the monopolized standard CUSIP to profit their conspiratorial enterprise to the detriment of competition and consumers. Indeed, former SEC Commissioner Daniel Gallagher stated in 2014 that there is a "de facto monopoly forcing the use of CUSIP in the fixed income markets…." What was originally a solution to the paperwork crisis in the securities industry transformed into a money-making machine cashing in on CUSIP's position as the entrenched standard.

## II.    S&P Abuses Its Monopoly Power and Defendants Conspire to Perpetuate That Abuse

### A.    Defendants Extort Licensing Fees from Data Users

49.     S&P's (now FactSet's) CGS charges licensing fees to Data Users for accessing CUSIPs via data feeds from Data Providers, who themselves pay fees to CGS for CUSIPs, or from downloading securities data with CUSIP identifiers on their own. As discussed above, S&P's CGS enters subscription agreements with two basic categories of consumers: (i) Data Providers and (ii) Data Users who either receive CUSIP numbers on their own or who receive CUSIP numbers through one or more Data Providers like Bloomberg. Data Providers typically supply services to Data Users in two ways: (i) through the use of CUSIPs as part of their own products and services and (ii) through outsourced or managed solutions, *e.g.*, trade processing and accounting. Hildene and members of the Class are Data Users, who either access CUSIP numbers on their own and pay

17

fees to CGS or who pay Data Providers like Bloomberg to access financial data—only a tiny fraction of which is CUSIP numbers—via a terminal while also paying licensing fees to CGS.

i.   <u>Defendants' abusive tactics force Plaintiff and members of the Class to sign subscription agreements and pay unreasonable licensing fees</u>

50.   S&P improperly leverages the fact that securities data is essentially useless unconnected to Financial Instruments Identifiers (*i.e.*, like baseball statistics without players' names) and that CUSIP is the standard for Financial Instruments Identifiers to demand unjustified licensing fees from Data Users. Defendants present Data Users with the following "choice": either pay S&P its demand or lose access to CUSIP identifiers, without which Data Users cannot continue to operate, putting their entire business at risk, because CUSIPs are the entrenched standard. There actually is no legitimate choice except to pay the monopolist whatever it demands.

51.   Armed with complete market power over a product essential for engaging in business in the securities industry, S&P uses strong-arm, unfair, and deceptive tactics to charge Plaintiff and members of the Class unreasonable and artificially inflated prices to merely include CUSIPs in their securities data when doing business. S&P threatens Data Users that it will cause Data Providers to strip CUSIPS from their data feed, damaging, if not destroying, their ability to conduct business, unless Data Users give in to Defendants' demands. The threat of such a significant disruption to business places Data Users in an unfair position of either paying S&P or risking a crippling disruption to their business.

52.   In the case of Hildene, it has an agreement with Bloomberg to obtain financial information and data, a small fraction of which include CUSIP numbers associated with data concerning particular financial instruments. Hildene receives data services from Bloomberg – not Defendants. Nevertheless, S&P's CGS's employees contacted Hildene in 2020 demanding that it

purchase a license because CUSIP numbers are included in data Hildene received from Bloomberg. Hildene rejected S&P's unreasonable demands.

53.     Because Hildene did not capitulate and pay S&P's licensing demand, S&P escalated its efforts to extract a fee from Hildene as they have done to other members of the Class. On March 19, 2021, Alison Romeo, a CGS Product Manager, sent Hildene's John Scannell a letter warning: "[I]f we do not hear from you or if we do not receive a completed CUSIP Use of Service Statement, we will have no choice but to contact all applicable ISPs [information service providers] that may furnish you with CGS Data in bulk, data feed or downloadable format, and enforce our rights to require such ISPs to discontinue furnishing your firm with this CGS Data." Ms. Romeo instructed Hildene to have its counsel contact Jeffrey Mitnick, an Associate General Counsel at S&P.

54.     On June 8, 2021, Mr. Mitnick sent another letter to Hildene threatening: "In the event that a satisfactory solution is not reached by June 25, 2021, we will have no choice but to send final notification to all applicable authorized vendors to cease servicing your firm with CGS Data." In plain language, Mr. Mitnick's threat was that S&P would remove the CUSIP numbers from securities data Hildene receives from Bloomberg, rendering that data useless.

55.     On August 31, 2021, S&P renewed its threat to Hildene. Daphne Shephard, a Director at S&P, informed Greg Resnick of Hildene: "[I]f we are unable to come to a resolution in [sic] prior to September 30, 2021 we will have no choice but to refer this matter to our legal department for further action which may include the removal of all CGS data from all sources into Hildene Capital." Ms. Shepard's threat was followed up with daily emails harassing Hildene to pay Defendants' demand or have CUSIP numbers stripped from all data Hildene receives. Ms. Shepard reiterated Defendants' threat in another email to Mr. Resnick dated September 9, 2021,

stating: "If we do not receive the executed agreements by September 30, 2021, our Licensing Compliance and Legal teams will continue the escalation process. At this juncture in the process, if CGS is unable to reach an agreement with Hildene Capital your firm may lose access to CGS data."

56.     Left with no real choice, Hildene ultimately signed the subscription agreement with S&P's CGS for an annual fee of $10,500. The negotiations occurred in New York and Connecticut, and the agreement is governed by New York law. Upon information and belief, the subscription agreement is a form agreement that S&P, negotiating and transacting in New York, demands all Data Users to execute.

57.     S&P's pressure tactics do not end with the signing of a subscription agreement. The form subscription agreement includes a "Usage Review" provision to inspect a Data User's records concerning the level of usage of the CUSIP identifiers to determine whether additional fees and charges should be imposed. S&P even retains the right to seek reimbursement for the cost of any such inspection if, in its discretion, the Data User is underpaying by five percent or more. S&P reserves the right to increase its fees and change the terms of the subscription agreement. Without any reasonable choice, the Data User is forced to accept these unfair and deceptive terms. In sum, S&P is using CUSIPs' designation as the standard and the threat of depriving market participants access to the standard to collect enormous sums of money (and share the money with ABA) from Hildene and members of the Class. It's an abuse of monopoly power, anticompetitive, and simply unfair.

      ii.     <u>S&P persistently used coercive tactics on market participants to extort unreasonable CUSIP licensing fees</u>

58.     S&P uses similar tactics on other Data Users and members of the Class to force payment of inflated CUSIP licensing fees that they can only charge by virtue of being the standard

and that are unrelated to any value of the CUSIPs themselves. Beginning in 2010, S&P began to abuse its monopoly power by charging unreasonable and arbitrary licensing fees for CUSIP identifiers. In the BDA, IAA, and GFOA's joint letter, the industry groups complained that "it is inappropriate for S&P to require payments (particularly given the history of widespread use in the marketplace) and it creates an unlevel playing field for potential competitors or service providers." The industry groups described "ongoing efforts by [S&P] to levy a toll on the majority of securities transactions, statements, disclosures, and electronic searches that occur daily in the United States."

59.    In that joint letter, the industry groups complained about S&P's "tactics regarding CUSIP fees" and the "rapidly increasing and non-transparent fee for use and redistribution of CUSIP identifiers." The industry groups explained that CUSIP fees "exert a chilling effect on market transparency and the free flow of information for investing, trading, accounting, risk management, and regulatory reporting," and that S&P's unfair "tactics," such as those described above in connection with Hildene, cause market participants that use CUSIP identifiers to "fear financial penalty."

60.    In January 2013, the BDA, IAA, and GFOA wrote jointly again to the SEC's then Chair, the Honorable Elisse Walter, to "express [their] deep concerns regarding the operation of the CUSIP system and the collection of fees for standard security identifiers." The industry groups wrote that since their last joint correspondence, S&P "continues to impose increasingly burdensome fees on issuers, underwriters, investment advisers, broker dealers, investors, and other bond market participants for the acquisition and use of CUSIP identifiers."

61.    Again in 2014, the same industry groups wrote a joint letter to the SEC's then Chair, the Honorable Mary Jo White, to reiterate their concerns with S&P's operation of the CUSIP system and that their previous concerns have continued unabated. The 2014 joint letter repeated

the same message from 2013: "S&P continues to impose increasingly burdensome fees on issuers, underwriters, investment advisers, broker/dealers, investors, and others for the acquisition, retention, and use of CUSIP identifiers." The letter requested the SEC to commence an immediate review of S&P's licensing practices relating to CUSIP identifiers.

62.     As recently as May 17, 2021, the IAA wrote to current SEC Chair, the Honorable Gary Gensler, concerning the effect of unfair, abusive, and deceptive CUSIP licensing practices on market participants. The IAA wrote, "We understand that S&P's efforts to obtain licensing fees for use of CUSIPs have become increasingly aggressive in recent years, with S&P threatening to freeze [the IAA's] ability to maintain CUSIPs in their databases unless they not only pay the fee determined by S&P but also allow S&P access to their databases to audit their use of CUSIPs." These are the same threats that S&P repeatedly made to Hildene. The IAA urged the SEC to work with the FTC (and the DOJ) "to initiate a review of S&P's licensing practices and consider whether requiring the use of [CUSIP] in regulatory filings poses potential liability, creates a monopoly on use fees, or is otherwise problematic." S&P's abusive CUSIP licensing practices have persisted unchecked for at least a decade, and throughout the entire class period defined below.

> iii.    S&P's CUSIP licensing fees impose significant costs to the industry and are unreasonable

63.     The S&P's anticompetitive and unfair business practices, effectuated with the help of co-conspirator ABA, result in significant costs to the Financial Instruments Identifiers market causing harm to competition and consumers. For example, on October 10, 2017, Bloomberg wrote to the SEC to voice its concern over the anticompetitive effect that CUSIP has in the market. Bloomberg wrote: "The process of obtaining a CUSIP, and the restrictive licensing imposed on its use imposes unnecessary burdens on firms by interrupting transactional flow and timing. This is evidenced by the assertion that *competition would be reduced*, liquidity would be negatively

affected, and parties would actively seek ways to avoid processes that would require use of a CUSIP." (emphasis added). By forcing market participants to pay arbitrary and unreasonable fees to use CUSIP, S&P "imposes a significant and restrictive cost on the industry as a whole" which negatively affects liquidity and causes a reduction in competition. Bloomberg also expressed concern that reinforcing the use of CUSIP would disadvantage "new technology and can instead stifle innovation."

64.     Even before S&P extorts Data Users for fees, S&P (and now FactSet) already collects fees from issuers of securities and Data Providers. There should be little cost in the initial issuance and recording of CUSIPs because, as the BDA, IAA, and the GFOA explained: "(1) the issuance of a CUSIP identifier is actually a simple administrative activity, requiring basic technology; and (2) distribution of CUSIP identifiers is a normal, daily activity of leading financial information vendors such as Bloomberg, Reuters, and Interactive Data Corporation, requiring no effort and no burden on [S&P]."

65.     And there is no additional cost borne by S&P to justify collecting a third round of fees for CUSIPs from Data Users. The fees constitute a windfall to S&P (and ABA) resulting from nothing more than its "hold up" tactics. S&P's demand of fees from Data Users stands in stark contrast to (i) the free FIGI Financial Instruments Identifiers that Defendants have sought to block as discussed below; and (ii) the fact that S&P does not charge European Data Users to access the international equivalent of CUSIP numbers as discussed below.

**B.     Defendants Continue their Abuse of the S&P's Monopoly Power in the U.S. Even After European Regulators Punish Similar Conduct**

66.     S&P tried a similar scheme in Europe, but European regulators put a stop to it. Beginning in 2009, the EU investigated S&P's licensing fee policies for the use of U.S. International Securities Identification Numbers ("US ISINs") in the European Economic Area

("EEA") and found them to be an abuse of monopoly power. The EU found that S&P's "behavior of imposing unfair prices affects end users as well as ISPs located in [the EEA]." According to EU spokesman Jonathan Todd, "S&P have a monopoly and we think they are abusing that monopoly by charging for the use of [US ISINs]."

67.     US ISINs are used by financial institutions internationally to identify financial instruments issued in the U.S. for clearing and settlement, financial reporting, and other communications.

68.     S&P distributes US ISINs through financial data vendors or information service providers "ISPs, which are the equivalent of U.S. Data Providers discussed above). Most financial institutions obtain US ISINs via ISPs. These ISPs rely on S&P as the only recognized authority to distribute US ISINs.

69.     The International Organization for Standardization ("ISO") developed the ISIN system as ISO standard 6166 as a public service to the financial services industry. ISO standard 6166 designated S&P as the responsible national numbering agency ("NNA") for the United States. As a result, S&P, similar to its CUSIP monopoly, had a monopoly for allocation of US ISINs and for electronic distribution and licensing of US ISINs via data feeds.

70.     The EU's decision penalized S&P for its charging practices for Data Users, which are similar to S&P's charging practices for Data Users in the United States. The EU's investigation found that Data Users were "required to pay license fees to S&P for using US ISINs in their own databases." According to the report, "it was S&P's practice to approach users which, according to the information provided to S&P by the ISPs, used or downloaded US ISINs as part of the information retrieved from ISPs. S&P obliged those users to enter into license agreements and to pay license fees for the use of US ISINs." The EU determined that "there should be no charges"

to Data Users who receive CUSIPs through ISPs. As part of the settlement, S&P has continued to provide US ISINs and committed to abolish all charges to those Data Users for the use of US ISINs within the EEA, demonstrating that there are no real costs associated with providing securities identifiers to Data Users and that S&P can operate the US ISIN system without such fees from Data Users.

71.     In a 2013 joint letter, the BDA, IAA, and GFOA informed the SEC about S&P's abusive licensing practices of CUSIP identifiers and that the EU "had already taken action against S&P for similar activities" in its licensing practices of ISINs. The next year, the industry groups again wrote to the SEC noting the EU's determination that S&P's licensing practices were an abuse of monopoly power. The letter insisted that the EU decision provided a "sufficient basis for the SEC to initiate a review of practices and procedures employed by S&P" over CUSIP identifiers.

### C.   Defendants Coordinate to Prevent FIGI from Offering a Free Financial Instruments Identifier that Would End Defendants' Licensing Windfall

72.     FIGI is a free, open-source identification system for financial instruments that "provides a mechanism for interoperability between identification systems." "The development of [FIGI] originated from the need for a standard methodology to bridge across multiple identification systems for financial instruments." FIGI uses a "metadata drive approach to enable the unique and persistent identification of financial instruments" and enables interoperability between other identification systems so that a Data User is not forced to use one single system. FIGI's interoperability feature offers flexibility for use in multiple functions and lowers complexity, dependencies, and costs of interacting with legacy systems, managing data and data quality, and sharing critical and universal information. The free nature of FIGI indicates that the operating costs of such financial instruments identification systems are, in fact, very low (especially if the costs of chasing down Data Users to pay unjustified licensing fees are eliminated)

73.     FIGI provides considerable benefits over CUSIP, especially given advancements in technology and approaches towards data use. FIGI can provide a unique identification at multiple levels of granularity across asset classes, can be used across product lines and markets, and solves various shortcoming of CUSIPs. Unlike CUSIP, FIGI does not restrict use or redistribution. A FIGI identifier is never reused and represents the same instrument in perpetuity. FIGI identification numbers thus can be utilized in data lineage to capture the different identifiers that exist, over time, to identify the same financial instrument. As a result, the use of FIGI "facilitates less manual intervention, fewer data errors, and quicker bookings."

74.     In contrast, CUSIP is not compatible with other identification systems, and CUSIPs change and are re-used over time. CUSIP numbers change for a variety of reasons, including simple changes in the name of a particular security. This can have a significant impact on traceability. Since CUSIPs can be re-used over time, the use of CUSIP increases the risk of "false linkages," complicating the settling and clearing of transactions. As Bloomberg recently explained, required use of CUSIP "tends to raise costs and diminish innovation," and the use of an identifier like FIGI "would be beneficial to the industry as a whole, in regard to transparency, increased data quality, removing unnecessary and burdensome costs, and *enabling competition*." (emphasis added).

75.     Market participants obviously would prefer a free and more technologically advanced identifier. For example, The Center for Municipal Finance, a fixed income market participant, wrote to the Municipal Securities Rulemaking Board ("MSRB") to support FIGI, explaining that "the value of CUSIP services does not justify such onerous costs" and that it preferred to use FIGI as an identifier. In fact, eighteen of the twenty comments received by the MSRB during a 2017 comment period regarding the use of FIGI, opposed the expanded use of

CUSIP and expressed agreement with open-source identification systems like FIGI as alternatives. The only two comments opposing FIGI were from ABA and S&P's CGS, consistent with Defendants' concerted efforts to block competitors in the Financial Instruments Identifiers market.

76.     In the absence of Defendants' anticompetitive and unfair business practices over the use of CUSIP, FIGI should have emerged as a viable replacement standard given that it is free and is at least an equal, if not a superior product. Defendants' agreement to entrench CUSIP as the industry standard, influence the standard setting process, and exclude competitors has foreclosed FIGI and other competitors from entering the market or gaining traction, thus injuring Plaintiff and members of the Class. Instead of a free and more innovative product, Hildene and members of Class are left with identifiers created back in the days of punch cards and are forced to pay hold up prices because they access data regarding financial instruments that necessarily include CUSIP identifiers. This outcome is not the product of a competitive market; it is the result of Defendants' anticompetitive conduct and unfair business practices.

## III.    S&P Breached Its Agreement to Offer FRAND Terms

77.     During the standard selection and approval process, S&P's CGS division filed a statement of willingness and made a binding commitment to X9 that it would offer CUSIP on FRAND terms. X9 requires compliance with FRAND terms in all cases where standard certification is granted. Once a standard is adopted, market participants will become "locked in" to a standard. As such, the standard holder obtains monopoly power over the market. CUSIP could not have been certificated as the national standard if S&P had not agreed to a binding obligation to adhere to the FRAND requirement. S&P's commitment is also reflected in CGS's License Fee Policy which provides that it charges "fair, reasonable and non-discriminatory license fees[.]"[7]

---

[7]    *See* CGS Licensing Policies FAQs, available at https://www.cusip.com/services/license-fees.html#/CGSLicensingPoliciesFAQs, (last accessed Oct. 4, 2021).

78.     FRAND terms are critical in the standard setting process, and standard setting organizations such as X9 require compliance with FRAND terms. The FRAND promise and obligation are critical tools in preventing monopoly hold up (or providing recourse if monopolists created through the standard setting process, as here, attempt to engage in "hold ups") and ensuring that the standard remains accessible to all who wish to utilize it. Here, however, the FRAND agreement was an empty promise as the enforcer, X9, was influenced and controlled by the party making the FRAND agreement and its co-conspirator ABA.

79.     The X9 report ratifying CUSIP as the American National Standard states that during the standard selection process S&P's CGS "filed a statement of willingness to grant a license under these rights on reasonable and nondiscriminatory terms and conditions to applicants desiring to obtain such a license." The statement of willingness is filed with and maintained by the standards developer. This FRAND agreement was reiterated by S&P on its CGS website.

80.     S&P, however, breached its binding agreement with X9 made during the standard selection process by charging Plaintiff and members of the Class unfair, unreasonable, and arbitrary licensing fees. Based on the fact that S&P can issue and maintain US ISINs in Europe without charging Data Users any fees, and FIGI can do everything for free, every dollar of licensing fees that S&P extracted from Hildene and other members of the Class is unreasonable, supracompetitive, and in breach of the FRAND agreement.

81.     Therefore, Hildene and members of the Class are entitled to the entirety of their licensing fees as damages.

## ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

82.     Defendants' anticompetitive conduct and exclusionary acts allowed Defendants to perpetuate S&P's (and now FactSet's) monopoly in the Financial Instruments Identifiers market,

to abuse S&P's monopoly and market power, and to unreasonably restrain trade to foreclose competitors from replacing CUSIP as the standard with a free product in order to charge supracompetitive and unreasonable licensing fees to Data Users (such as Hildene) that download data containing CUSIP numbers.

83.   Defendants' conduct adversely affected competition and consumers by:

1.   charging prices for Data Users' access to CUSIP identifiers at artificially high levels;

2.   threatening Data Users with stripping CUSIP numbers from their data feeds unless they signed subscription agreements with S&P's CGS; and

3.   utilizing its control over X9 to prevent competitors, such as FIGI, from entering the Financial Instruments Identifiers market with a free replacement for CUSIP.

84.   No legitimate pro-competitive efficiencies justify Defendants' conduct in abusing S&P's monopoly power and unreasonably restraining trade to extort fees from Data Users that download information containing CUSIP numbers.

85.   Absent Defendants' anticompetitive conduct and abuse of S&P's monopoly power, Plaintiff and members of the Class would not have had to enter subscription agreements and pay S&P substantial amounts of annual fees to avoid having CUSIP numbers stripped from data downloaded on their own or from Data Providers, such as Bloomberg.

86.   By unlawfully excluding and impairing competition and abusing S&P's monopoly power, Defendants' conduct has caused Plaintiff and other members of the Class to pay more to access CUSIP numbers than they otherwise would have paid absent Defendants' illegal, exclusionary conduct.

87.   As a result of the Defendants' unlawful, anticompetitive conduct, Plaintiff and members of the Class were compelled to pay, and did pay, artificially inflated, unreasonable and

arbitrary prices for the CUSIP numbers they downloaded on their own or from their Data Providers.

## DAMAGES

88.     Plaintiff and other Data Users paid artificially high and supracompetitive prices to S&P in subscription agreements above those prices that would have prevailed (i) if S&P had not breached its FRAND obligations; (ii) if S&P had not maintained and abused its monopoly power; (iii) if Defendants had not conspired to maintain and abuse S&P's monopoly power; (iv) if Defendants had not conspired to unreasonably restrain trade; and (v) if Defendants had not engaged in unfair business practices, which all have independently and collectively caused damages. The fees that Data Users paid S&P, which were shared with ABA, have no relation to any value provided by S&P, but rather are excessive payments Data Users were forced to incur to avoid having CUSIP numbers stripped from data they downloaded on their own or downloaded from their Data Providers.

89.     Plaintiff and members of the Class have, consequently, paid more for access to CUSIP numbers than they would have paid absent S&P's abuse of its monopoly power and Defendants' conspiracy to maintain such monopoly power in S&P (and now FactSet), Defendants' anticompetitive conspiratorial conduct, and S&P's violation of its FRAND commitment. FIGI's creation of a free alternative to CUSIP demonstrates that Plaintiff and members of the Class should not have been forced to pay any fees to S&P merely for accessing CUSIPs through data feeds from Data Providers.

## CLASS ACTION ALLEGATIONS

90.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and Rules 23(b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and seeks monetary damages and injunctive relief on behalf of the following Class:

> All persons and entities in the United States who are Data Users and
> who entered subscription agreements for CUSIP licensing fees and
> paid those licensing fees directly to S&P's (and now FactSet's) CGS
> division between March 7, 2018 through March 7, 2022 (the "Class
> Period").

91.     ***Numerosity***. The Class is individually so numerous that joinder is impracticable. While Plaintiff does not know the exact number of members of the Class at this time, based on the nature of the trade and commerce involved and Defendants' statements in letters to Plaintiff discussed above, Plaintiff reasonably believes that there are thousands of members in the Class and that their identities can be obtained from records, including executed subscription agreements, in Defendants' possession, custody or control. Members of the Class are geographically dispersed throughout the United States.

92.     ***Typicality***.  Plaintiff and members of the Class have all sustained damage in that, during the Class Period, they purchased licenses to use CUSIP directly from S&P at artificially maintained, supracompetitive prices, established arbitrarily by Defendants in connection with the anticompetitive behavior alleged herein. Defendants' anticompetitive conduct, the effects of such violations, and the relief sought are all issues or questions that are common to Plaintiff and the other Class members.

93.     ***Adequacy of Representation***. Plaintiff will fairly and adequately protect and represent the interests of the Class members and has retained counsel competent and experienced in class action and antitrust litigation. Plaintiff's interests are coincident with, and not antagonistic to, the interest of the other Class members. Plaintiff and its counsel have the necessary legal acumen and financial resources to litigate this class action adequately and vigorously.

94.     ***Commonality and Predominance***. Common questions of law and fact exist as to all similarly situated members of the Class and predominate over any questions affecting solely individual

31

members of the Class, thereby making a common methodology for determining Class damages appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct. The questions of law and fact common to the Class include, but are not limited to:

a. whether the Financial Instruments Identifiers market in the United States constitutes a relevant market;

b. whether S&P (and now FactSet) possesses monopoly and market power in the Financial Instruments Identifiers market;

c. whether, through the conduct alleged herein, S&P willfully acquired or maintained and enhanced its monopoly power in the Financial Instruments Identifiers market;

d. whether S&P monopolized the relevant market by engaging in unlawful exclusionary conduct to acquire, maintain or enhance its monopoly power in the financial Instruments Identifiers market;

e. whether, and to what extent, S&P's conduct caused Plaintiff and Class members to pay supracompetitive prices for CUSIP licenses and, thereby, suffer antitrust injuries;

f. whether the Defendants conspired for S&P (and now FactSet) to possess monopoly and market power in the Financial Instruments Identifiers market;

g. whether, through the conduct alleged herein, the Defendants conspired for S&P to willfully acquire or maintain and enhance its monopoly power in the Financial Instruments Identifiers market;

h.  whether the Defendants conspired for S&P to monopolize the relevant market by engaging in unlawful exclusionary conduct to acquire, maintain or enhance S&P's monopoly power in the Financial Instruments Identifiers market;

i.  whether the Defendants conspired to unreasonably restrain trade in the relevant market by engaging in unlawful exclusionary conduct to acquire, maintain or enhance S&P's monopoly power in the Financial Instruments Identifiers market;

j.  whether, and to what extent, the Defendants' conspiratorial conduct caused Plaintiff and Class members to pay supracompetitive prices for CUSIP licenses and, thereby, suffer antitrust injuries;

k.  whether the alleged conspiracy to retrain trade alleged herein violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

l.  whether the alleged monopolization alleged herein violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

m.  whether the alleged conspiracy to monopolize alleged herein violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

n.  whether, and to what extent, S&P violated its FRAND agreement in charging Plaintiff and Class members supracompetitive prices for CUSIP licenses;

o.  whether, and to what extent, Defendants' conduct was unfair and had the capacity to and did materially deceive or threaten Plaintiff and similarly situated Class members when transacting business in the State of New York;

33

p.  whether, and to what extent, Defendants' conduct was unfair and had the capacity to and did materially deceive or misled Plaintiff and similarly situated Class members when transacting business in the State of Connecticut;

q.  whether Plaintiff and the Class members are entitled to injunctive relief; and

r.  whether Plaintiff and the Class members are entitled to damages, and if so, the appropriate measure of damages.

95.  *Superiority.* A class action is a superior method for the fair and efficient adjudication of the controversy because joinder of all members of the Class is impracticable.  Such treatment will permit many similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in managing this class action. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

96.  Plaintiff seeks injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. Defendants have acted or refused to act on grounds that apply generally to the Class so that final injunctive relief is appropriate respecting the Class. The Class members' claims and interests are cohesive.

34

## PLAINTIFF'S FAIR USE OF CUSIPS

97.     CUSIP identifiers are purely factual information—numbers and letters that identify a specific security. CUSIP identifiers nevertheless serve the important role of providing critical information identifying financial instruments to investors, analysts, and other participants in securities markets. Plaintiff uses CUSIP numbers merely as identifiers for financial instruments that are necessarily included with data that Plaintiff accesses and downloads in the normal course of its business. In the EU's investigation of S&P's licensing fee policies for the use of US ISIN numbers described above, the EU Commission described ISIN numbers as "the mere use of numbers," "trivial" and "not original" and questioned whether something so trivial and unoriginal could be subject to copyright protection. Plaintiff does not collect any revenue as a direct consequence of its download or use of CUSIP identifiers, and any commercial gain is incidental to such use. It makes no difference to Plaintiff's business what entity generated the alphanumerical sequences that identify securities or what alphanumerical sequences are connected to which securities. Rather, Plaintiff uses CUSIPs simply because they are the standard Financial Instruments Identifiers.

98.     Plaintiff's use of CUSIPs is reasonable and fair as its use is proportional to the need to accurately identify specific financial instruments in connection with its analysis, purchase, sale and monitoring of such financial instruments. Plaintiff accesses CUSIPs for the specific securities it analyses or monitors as part of its business, which represents a small fraction of the total CUSIP numbers in circulation. Plaintiff's use also has little impact on the commercial market for licensing fees because Defendants are free to, and do, collect such fees from the issuers of securities and Data Providers. Plaintiff's use of CUSIPs therefore will not diminish Defendants' ability to collect such fees from issuers and Data Providers who purchase access to the CUSIP database or the

CUSIP identifiers themselves from Defendants to publish on their databases for Data Users to access.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Violations of Section 1 of the Sherman Act – Conspiracy to Restrain Trade)**
**(Against All Defendants)**

99. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

100. Defendants have engaged in a conspiracy to unreasonably restrain trade in the market for Financial Instruments Identifiers in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

101. By acts, practices, and conduct described above, Defendants have agreed and conspired to use the standard-setting process to unreasonably restrain trade in the Financial Instruments Identifiers market to (i) charge artificially inflated, arbitrary licensing fees simply because CUSIPs are the standard, unrelated to any actual value in the random string of numbers and letters; (ii) influence X9 to select CUSIP as the standard; and (iii) exclude FIGI and other potential competitors from the market for Financial Instruments Identifiers, thereby further entrenching S&P's (and now FactSet's) s monopoly and denying Plaintiff and members of the Class access to competitors' services and products, including a free alternative product.

102. As a direct, material, and proximate result of the Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiff and members of the Class have been injured and suffered damages in an amount to be proved at trial and without injunctive relief, Plaintiff and members of the Class will continue to suffer injury as a result of Defendants' ongoing unlawful conduct.

103. Such contract, combination, or conspiracy constitutes a per se violation of the

federal antitrust laws. Moreover, there is no procompetitive justification for the Defendants' unlawful conduct in unreasonably restraining trade in the Financial Instruments Identifiers market to charge artificially inflated licensing fees to Data Users with no connection to the value, if any, of the services provided. Even if there is such a conceivable procompetitive benefit or justification, the anticompetitive effects of Defendants' conduct far outweigh any such justification and could have been obtained by less restrictive alternatives.

104.    Plaintiff and members of the Class are also entitled to actual damages trebled for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, under Section 4 of the Clayton Act, 15 U.S.C. § 15.

**SECOND CAUSE OF ACTION**
**(Violations of Section 2 of the Sherman Act – Monopolization)**
**(Against Defendant S&P)**

105.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

106.    S&P has engaged in monopolization of the market for Financial Instruments Identifiers in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, *et seq.*

107.    By acts, practices, and conduct described above, S&P has used the standard setting process to willfully and unlawfully maintain its monopoly in the Financial Instruments Identifiers market to (i) charge artificially inflated, arbitrary licensing fees simply because CUSIPs are the standard, unrelated to any actual value in the random string of numbers and letters; and (ii) exclude FIGI and other potential competitors from the market for Financial Instruments Identifiers, thereby further entrenching its monopoly and denying Plaintiff and members of the Class access to competitors' services and products, including a free alternative product.

108.    As a direct, material, and proximate result of S&P's violations of Section 2 of

the Sherman Act, 15 U.S.C. § 2, Plaintiff and members of the Class have been injured and suffered damages in an amount to be proved at trial and without injunctive relief, Plaintiff and members of the Class will continue to suffer injury as a result of S&P's unlawful conduct.

109.    There is no procompetitive justification for S&P's unlawful conduct in maintaining its monopoly over the market for Financial Instruments Identifiers and abusing its monopoly power to charge artificially inflated licensing fees to Data Users with no connection to the value, if any, of the services provided. Even if there is such a conceivable procompetitive benefit or justification, the anticompetitive effects of S&P's conduct far outweigh any such justification and could have been obtained by less restrictive alternatives.

110.    Plaintiff and members of the Class are also entitled to actual damages trebled for S&P's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, under Section 4 of the Clayton Act, 15 U.S.C. § 15.

**THIRD CAUSE OF ACTION**
**(Violations of Section 2 of the Sherman Act – Conspiracy to Monopolize)**
**(Against All Defendants)**

111.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

112.    Defendants have engaged in a conspiracy to monopolize the market for Financial Instruments Identifiers in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, *et seq.*

113.    By acts, practices, and conduct described above, Defendants have conspired to use the standard setting process to willfully and unlawfully maintain S&P's monopoly in the Financial Instruments Identifiers market to (i) charge artificially inflated, arbitrary licensing fees simply because CUSIPs are the standard, unrelated to any actual value in the random string of numbers and letters; and (ii) exclude FIGI and other potential competitors from the market for

Financial Instruments Identifiers, thereby further entrenching the S&P's monopoly and denying Plaintiff and members of the Class access to competitors' services and products, including a free alternative product.

114.   As a direct, material, and proximate result of Defendants' violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, Plaintiff and members of the Class have been injured and suffered damages in an amount to be proved at trial and without injunctive relief, Plaintiff and members of the Class will continue to suffer injury as a result of Defendants' ongoing unlawful conduct.

115.   There is no procompetitive justification for the Defendants' unlawful conduct in maintaining S&P's monopoly over the market for Financial Instruments Identifiers and abusing its monopoly power to charge artificially inflated licensing fees to Data Users with no connection to the value, if any, of the services provided. Even if there is such a conceivable procompetitive benefit or justification, the anticompetitive effects of Defendants' conduct far outweigh any such justification and could have been obtained by less restrictive alternatives.

116.   Plaintiff and members of the Class are also entitled to actual damages trebled for Defendants' violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, under Section 4 of the Clayton Act, 15 U.S.C. § 15.

**FOURTH CAUSE OF ACTION**
**(Violations of the New York General Business Law § 349(a))**
**(Against All Defendants)**

117.   Plaintiff incorporates and re-alleges all of the foregoing paragraphs.

118.   At all times relevant herein, the New York General Business Law ("GBL") was in effect. GBL § 349(a) makes unlawful the use of "[d]eceptive acts or practices in the conduct of any business" in the State of New York that cause injury to consumers within the State, including Plaintiff and members of the Class.

119.   Defendants were and are doing business in the State of New York and thus are subject to New York law for their acts, practices, and conduct described in this action.

120.   Defendants' actions complained of herein are consumer-orientated and are deceptive acts and practices in the conduct of Defendants' business that have the capacity to and did deceive Plaintiff, and members of the Class, while transacting business in New York, as well as Data Users in the Financial Instruments Identifiers market at large.

121.   Defendants' acts, practices, and conduct described herein were unfair and materially deceptive or misleading. Defendants engaged in purposeful and unlawful anticompetitive behavior, predicated on deceptive conduct described above, to ensure that CUSIP remained the Financial Instruments Identifiers standard to thwart competitors' products and services from entering the Financial Instruments Identifiers market, and to force Data Users to enter subscription agreements under the threat of losing access to CUSIPs. S&P (and now FactSet), armed with monopoly power, conspired with the ABA to use threatening and deceitful business practices in the State of New York to coerce payment of artificially inflated and arbitrary licensing fees from Plaintiff and the Class. Defendants' collection of licensing fees to access CUSIP numbers in violation of federal antitrust laws is intrinsically deceptive and misleading to Plaintiff and members of the Class in New York.

122.   As a result of Defendants' materially deceptive or misleading conduct and practices, Plaintiff and members of the Class have been injured and have incurred damages by Defendants' unlawful acts.

123.   The foregoing acts and practices directly, foreseeably, and proximately caused Plaintiff and other members of the Class to suffer an ascertainable loss in the form of payment of unfair and arbitrary licensing fees to access CUSIP identifiers, and Plaintiff and members of the

Class are entitled to recover such damages, together with appropriate penalties, including punitive damages, attorneys' fees and costs of suit. Accordingly, Defendants violated GBL § 349(a) through their actions described herein.

## FIFTH CAUSE OF ACTION
### (Violations of Connecticut Unfair Trade Practices Act § 42-110b(a))
### (Against All Defendants)

124.    Plaintiff incorporates and re-alleges all of the foregoing paragraphs.

125.    At all times relevant herein, the Connecticut Unfair Trade Practices Act ("CUTPA") was in effect. CUTPA § 42-110b(a) states that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" in Connecticut that cause injury to people or entities doing business or that reside in the State including Plaintiff and members of the Class.

126.    Defendants were and are doing business in the State of Connecticut and thus are subject to Connecticut law for their acts, practices, and conduct described in this action. Plaintiff brings claims on behalf of a Class of similarly harmed parties that were injured in Connecticut, or that reside in the State, by Defendants' misconduct in Connecticut.

127.    Defendants' unfair methods of competition and materially deceptive and unfair acts or practices that occurred or emanated in the conduct of commerce in Connecticut caused substantial injury to Plaintiff and other members of the Class in connection with Defendants' materially unfair or deceptive and threatening business practices to extort payment of artificially inflated and arbitrary licensing fees from Data Users to access CUSIP identifiers. Defendants engaged in purposeful and unlawful anticompetitive behavior, predicated on deceptive and unfair conduct of commerce described above, to ensure that CUSIP remained the Financial Instruments Identifiers standard to thwart competitors' products and services from entering

41

the Financial Instruments Identifiers market, and to force Data Users to enter subscription agreements under the threat of losing access to CUSIPs. S&P (and now FactSet), armed with monopoly power, conspired with ABA to use threatening, unfair, and deceitful business practices in the State of Connecticut to coerce payment of artificially inflated and arbitrary licensing fees from Plaintiff and the Class. Defendants' collection of licensing fees to access CUSIP numbers in violation of federal antitrust laws is an intrinsically unfair method of commerce and is materially deceptive and misleading to Plaintiff and members of the Class in Connecticut.

128.    As a result of Defendants' unfair methods of competition and deceptive and unfair business practices occurring within the State, Plaintiff and other members of the Class have suffered ascertainable losses within the meaning of CUTPA § 42-110g(a) and have been damaged by Defendants' unlawful acts.

129.    The foregoing acts and practices directly, foreseeably, and proximately caused Plaintiff and other members of the Class to suffer an ascertainable loss in the form of payment of unfair and arbitrary licensing fees to access CUSIP identifiers, and Plaintiff and members of the Class are entitled to recover such damages, together with appropriate penalties, including punitive damages, attorneys' fees and costs of suit. Accordingly, Defendants violated CUTPA § 42-110b(a) through their actions described herein.

### SIXTH CAUSE OF ACTION
**(Breach of Contract)**
**(Against Defendant S&P)**

130.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

131.    S&P, through its CGS division, entered into an agreement with X9, under

which it agreed that, as a condition to X9 setting CUSIP as the standard, CGS would license

such rights to the CUSIP database on FRAND terms to applicants desiring to obtain such a

license. During the standard selection and approval process, S&P's CGS, filed a statement of

willingness and entered a binding agreement to X9 that it would offer access to the CUSIP

database on FRAND terms.

132.    Plaintiff, and each potential licensee to the CUSIP database, were intended

third-party beneficiaries of the agreement between X9 and S&P.

133.    S&P has breached that agreement by not licensing the essential rights to the

CUSIP database on FRAND terms.

134.    As a result of S&P's breach of its agreement to license rights to the CUSIP

database on FRAND terms, Plaintiff and members of the Class have been injured through the

payment of licensing fees that are not fair, reasonable or non-discriminatory.

135.    Plaintiff and members of the Class have been injured and suffered damages in

an amount to be proved at trial.

**SEVENTH CAUSE OF ACTION**
**(Injunctive Relief)**
**(Against All Defendants)**

136.    Plaintiff incorporates the allegations set forth in the foregoing paragraphs as

though set forth herein.

137.    This is a claim for injunctive relief under Section 16 of the Clayton Act, 15

U.S.C. § 26. Plaintiff and Class members seek injunctive relief under 15 U.S.C. § 26 to correct

the anticompetitive effect caused by Defendants' unlawful conduct. As explained above,

Defendants are in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C §§ 1, 2.

138.    Defendants' unlawful conduct threatens to continue to injure Plaintiff and Class

members. Plaintiff seeks a permanent injunction prohibiting Defendants from continuing their illegal conspiracy and abuse of S&P's (and now FactSet's) monopoly power by charging Data Users fees for downloading data containing CUSIPS, and ordering them to take appropriate remedial action to correct and eliminate any remaining effects of the conspiracy.

### EIGTH CAUSE OF ACTION
### (Declaratory Judgment, 22 U.S.C. § 2201, Fair Use)

139.    Plaintiff incorporates and re-alleges all of the foregoing paragraphs.

140.    There is an actual case and controversy concerning whether Plaintiff's use of CUSIP identifiers is fair use under 17 U.S.C. § 107 such that it does not infringe on the ABA's or any other Defendant's purported intellectual property rights over CUSIP identifiers. A judicial determination of the parties' rights and duties is necessary and appropriate at this time and under these circumstances to resolve the controversy between the parties and afford relief from the uncertainty and insecurity giving rise to this proceeding.

141.    Plaintiff requests that a judicial determination be made, pursuant to 28 U.S.C § 2201, that Plaintiff's use of CUSIP identifiers constitutes fair use such that it does not infringe on the ABA's or any other Defendant's purported intellectual property rights in CUSIP identifiers.

142.    An opportunity for fair use of copyrighted materials is necessary to promote progress in information transmission. Four non-exclusive factors are properly considered in determining whether the use made of a work in any particular case is a fair use. These statutory factors are: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. Each of these factors strongly weigh in favor of determining that Plaintiff's use of CUSIPs

44

is a fair use.

143.    First, the purpose and character of Plaintiff's use of CUSIPs supports a determination that the use constitutes a fair use. Plaintiff's use of individual CUSIPs is merely as identifiers for financial instruments that necessarily attach to financial data that Plaintiff accesses and downloads in the regular course of business. Plaintiff does not generate revenue as a direct consequence of using CUSIP identifiers, but rather uses them because they are the standard Financial Instruments Identifiers. It would make no difference to Plaintiff's business whether Defendants, FIGI or some other entity generated the string of numbers and letters that identify financial instruments. Thus, any generated revenue that can be attributed to the use of CUSIP is merely incidental to a given transaction involving financial instruments.

144.    Second, the nature of CUSIPs supports a determination that Plaintiff's use constitutes a fair use. CUSIP identifiers are purely factual information comprised of simple alphanumeric sequences. The ABA's purported copyright over the CUSIP numbers themselves is thin as it covers pure factual information identifying financial instruments that serves a key function in securities markets. Indeed, CUSIP identifiers are not an expression, but a factual conveyance.

145.    Third, Plaintiff's use of CUSIPs is also reasonable and fair as it is proportional to the need to access the identifiers for financial instruments for which it accessed or downloaded information on from its Data Provider. Plaintiff only accesses the CUSIP numbers, which constitute a small fraction of the total CUSIP numbers in circulation, for the financial instruments it analyzes or monitors as part of its business.

146.    Fourth, Plaintiff's use of CUSIP numbers has little impact on the commercial market for fees since Defendants collect such fees from the issuers of financial instruments and

Data Providers. Plaintiff's use of CUSIP identifiers will not diminish the ability of Defendants to collect such fees from securities issuers and Data Providers who purchase access to the CUSIP database or the CUSIP identifiers from Defendants to publish such CUSIP numbers on their databases for Data Users to access. Rather, Data Users create the demand for Data Providers to pay fees to publish CUSIPs as part of their data feeds.

147.    Accordingly, Plaintiff is entitled to a judgment declaring that its use of CUSIP identifiers constitutes fair use and does not infringe on the ABA's or any other Defendant's purported intellectual property rights.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of itself and the proposed Class of similarly situated entities, respectfully requests that the Court:

A.    Determine that this action may be maintained as a class action and issue a certification order pursuant to Federal Rules of Civil Procedure 23(a)-(c), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, declare Plaintiff as the representative of the Class, and Plaintiff's chosen counsel as Class Counsel pursuant to Federal Rule of Civil Procedure 23(g);

B.    Adjudge and decree that the unlawful conduct alleged herein violates Section 1 of the Sherman Act, Section 2 of the Sherman Act, Section 349(a) of the New York General Business Law, and Section 42-110b(a) of the Connecticut Unfair Trade Practices Act;

C.    Permanently enjoin and restrain Defendants from continuing and maintaining S&P's (and now FactSet's) abuse of monopoly power alleged in the Complaint under Section 16 of the Clayton Act, 15 U.S.C. § 26;

D.    Award Plaintiff and the Class damages against Defendants for their violations

of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.      Award Plaintiff and the Class reasonable attorneys' fees and costs pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15;

F.      Award Plaintiff and the Class damages against S&P for its breaches of contract;

G.      Award Plaintiff and the Class damages against Defendants for their violations of GBL Section 349(a), together with appropriate penalties, including punitive damages, attorneys' fees and costs of suit;

H.      Award Plaintiff and the Class damages against Defendants for their violations of CUTPA Section 42-110b(a), together with appropriate penalties, including punitive damages, attorneys' fees and costs of suit;

I.      Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity;

J.      Declare that Plaintiff's use of CUSIP identifiers constitutes fair use under 17 U.S.C. § 107; and

K.      Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the Class hereby demand a trial by jury on all issues triable by a jury.

Dated: March 7, 2022

Respectfully Submitted,

WOLLMUTH MAHER & DEUTSCH LLP

By: */s/ David H. Wollmuth*
David H. Wollmuth
R. Scott Thompson
Ronald J. Aranoff
Ryan A. Kane
Grant J. Bercari
500 Fifth Avenue, 12th Floor
New York, New York 10110
Telephone: (212) 382-3300
dwollmuth@wmd-law.com
sthompson@wmd-law.com
raranoff@wmd-law.com
rkane@wmd-law.com
gbercari@wmd-law.com