

September 23, 2022

*By ECF*
The Honorable Katherine Polk Failla
United States District Court for the Southern District of New York
40 Foley Square, Room 2103
New York, New York 10007

Re:   *Dinosaur Fin. Grp. LLC, et al. v. S&P Global, Inc., et al.*, 22-cv1860 & 22-cv-1929

Dear Judge Failla:

Defendants' pre-motion letter (ECF 74) ("Def. Ltr") ignores the most basic standard governing motions to dismiss: the Court accepts all well-pleaded factual allegations as true. *See Peralta v. St. Luke's Roosevelt Hosp.*, 2015 WL 3947641, at *1 n.1 (S.D.N.Y. June 26, 2015). As set forth below, Defendants ignore many allegations and invent others to fit their theories for dismissal, such as claiming the Consolidated and Amended Complaint ("CAC") (ECF 70) alleges vertical agreements, when the CAC explicitly alleges horizontal agreements, CAC ¶¶ 24, 121; claiming that Defendants only asserted a copyright in a database, when the CAC clearly asserts Defendants did so with respect to the CUSIP numbers only, *id*. ¶¶ 86-7; and claiming the CAC does not allege Defendants threatened lawsuits over the use of CUSIPS alone, when the CAC includes specific allegations of exactly those threats, *id*. ¶¶ 10, 78-9, 101-03. Defendants have no viable grounds to bring a motion to dismiss.

I.   **The CAC's Market Definition Is Plausible**

The CAC defines the product market as the CUSIP Use Market. CAC ¶¶ 139-46. This is distinct from the market for issuing new CUSIPs for financial instruments. *Id*. ¶ 139.

Defendants argue that Plaintiffs "suggest" that Bloomberg's identifiers (FIGI) compete with the CUSIP numbers, "thereby implying the appropriate market is securities identifiers, not a single-brand market limited to CUSIPs." Def. Ltr. at 4. This argument ignores the CAC's actual allegations. The CAC alleges CUSIP numbers are the standard and alternative numbering systems, including FIGI s, "are inadequate substitutes for CUSIP numbers because the CUSIP numbering system is and has been the standard for decades." CAC ¶ 142. The CAC's market definition is consistent with the CAC's allegations concerning FIGI as the CAC alleges that Defendants excluded FIGIs from consideration by the X9 committee to ensure "Defendants' continued ability to control the CUSIP Use Market…." *Id*. ¶ 53. The CAC further alleges, alternative numbering systems "did not constrain S&P's [now FactSet's] ability to raise or maintain prices of licenses for

use of CUSIP numbers without losing substantial sales … because Defendants successfully excluded other competitors from replacing CUSIP numbers as the standard." *Id*. ¶ 143.

Defendants also attack Plaintiffs' market definition as "deficient" because, in addition to the CUSIP numbers, CUSIP Users also need the issuer's name and the description of the issue. Def. Ltr. at 4. While Defendants' argument is unclear to us, they appear to be arguing that the ABA has an intellectual property ("IP") right not only in the CUSIP numbers, but also in the corresponding issuer names and issue descriptions, which, if true, may bar the Data Vendors from providing that data to CUSIP Users. The problem with that argument is that it is the issuer, not the ABA, that authors both its name and the description of the issue. CAC ¶ 23. In addition to having no copyright in the CUSIP numbers, the ABA has no protectible right in either the issuer's name or the description of the issue and therefore cannot block the Data Vendors from providing any of these data elements to CUSIP Users, separately or together.

II. **The CAC Adequately Pleads that Defendants Engaged in Horizontal Anticompetitive Conduct**

**Group Boycott Claim.** A *per se* group boycott exists where horizontal competitors with a dominant position in the relevant market agree to boycott a potential rival and cut off access to an input necessary for the boycotted firm to compete. *PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 344-346 (S.D.N.Y. 2021). The CAC alleges each of these elements. *First*, S&P and FactSet are data vendors that organized with their horizontal competitors—other Data Vendors—a group boycott of CUSIP Users that refused to enter license agreements with S&P and FactSet. CAC ¶¶ 24, 121. *Second*, the agreements with the Data Vendors forced the Data Vendors to cease providing CUSIP numbers—an essential input necessary to compete, *id*. ¶¶ 9, 24-5, 183—to any CUSIP User refusing to sign a license agreement. *Id*. ¶¶ 119-21; 182-87. *Third*, S&P and now FactSet have had a 100% share of the CUSIP Use Market. *Id*. ¶ 141. Defendants nevertheless assert the CAC does not plead horizontal agreements because they claim, contrary to the CAC allegations, that CUSIP Global Services ("CGS"), rather than S&P and FactSet, organized the group boycott. Def. Ltr. at 1. This is not what Plaintiffs allege. The CAC does not allege that CGS is or was an independent corporate entity. Rather, the CAC alleges that CGS is a division—formerly of S&P and now of FactSet. CAC ¶¶ 5, 43.

**Horizontal Restraints of Trade.** Defendants' argument that the CAC does not adequately plead a horizontal restraint of trade is wrong. *First*, Defendants' primary argument that a data supplier may lawfully require prospective end users to pay for commercial use of its data, Def. Ltr. 2, is based on a distortion of the CAC. The CAC alleges horizontal restraints of trade among competitors, not vertical restraints of trade between a supplier and end user. *See* CAC ¶¶ 24, 121 (alleging agreement among S&P (and now FactSet) and the Data Vendors).

*Second*, Defendants' mischaracterization of the complaint as involving vertical restraints of trade, even if alleged, which it is not, requires that the data supplier have an IP right allowing it to lawfully preclude prospective end users from using the data without a license. *See New York Mercantile Exchange, Inc. v. IntercontinentalExchange, Inc.*, 497 F.3d 109 (2d Cir. 2007) (closing prices are not copyrightable, and an exchange could not preclude a rival exchange from using them). Absent such an IP right—the absence of which the CAC pleads (¶¶ 15-19)—the data supplier has no legal right to preclude distributors from providing data to end users. *Id*. The *Qualcomm* and *MiniFrame* cases that Defendants cite therefore are inapposite because they

involved a manufacturer that owned IP in its products and unilaterally implemented a policy of licensing that IP. But, unlike here, there was no dispute there that defendants owned valid IP in the products at issue. *See, e.g., FTC v. Qualcomm, Inc.*, 969 F.3d 974 (9th Cir. 2020) (Qualcomm's patented cellular technology); *MiniFrame Ltd. v. Microsoft Corp.*, 2013 WL 1385704 (S.D.N.Y. Mar. 28, 2013) (Microsoft's operating system software), *aff'd*, 551 F. App'x 1 (2d Cir. 2013).

*Third*, Defendants assert "CGS could charge Data Vendors a fee calculated based on those Data Users' data consumption—so charging fees to Data Users directly has no cognizable effect on competition." Def. Ltr. at 2. But this assertion ignores that CUSIP numbers are not copyrightable, that competitive-effects arguments are irrelevant to *per se* claims, *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 775 (2d Cir. 2016), and that a rule of reason case need only allege an adverse effect as a whole in a relevant product market, *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998), all of which Plaintiffs have done. *See* CAC ¶¶ 163-76.

*Fourth*, Defendants question Plaintiffs' allegations regarding Xignite's attempt to create a competing service by stating that Xignite was using "purportedly 'independent' sources." Def. Ltr. at 2. But the CAC alleges that Xignite was using independent sources, not "purportedly" independent sources, and S&P demanded that Xignite destroy its independently derived inventory of CUSIP numbers, which Xignite did. CAC ¶¶ 78, 89. At most, Defendants' argument raises an issue of fact, inappropriate for resolution on a motion to dismiss. Defendants' related argument that S&P lawfully could deprive Xignite of access to the CUSIP numbers could be true *only* if the CUSIP numbers are copyrightable, which they are not and which is the core issue in the case.

**Standard Setting.** The CAC more than plausibly alleges that Defendants conspired to abuse the standard-setting process to prevent competition in the CUSIP Use market and enable Defendants to continue receiving monopoly returns. CAC ¶ 24. The CAC specifically details that Defendants controlled the standard-setting process because the ABA owned the standard-setting body, X9, and repeatedly selected itself for the standard. *Id*. at ¶¶ 51-53. Even after X9 ostensibly separated from the ABA, Defendants maintained control over X9 by appointing their own executives to senior positions at X9, *id*., and continuing to conspire to ensure X9 designated CUSIP as the standard, notwithstanding a free potential alternative in FIGI. *Id.* ¶¶ 24, 53-4, 195. Defendants' contention that X9 finally approved FIGI less than a year ago, Def. Ltr. n. 3, simply underscores that FIGI was a potential competitor. This belated approval does not atone for the prior years where FIGI was available (and free) but was prevented from attempting to compete with Defendants. *Id.* ¶¶ 54, 195. Moreover, the CAC alleges Defendants' common motive for conspiring to abuse its control of the standard-setting process: Defendants exploited CUSIP's designation as the standard to force CUSIP Users to pay unfair fees based on false claims of copyright and threats to cut off CUSIP Users' access to CUSIP numbers. *Id.* ¶¶ 93-109. The exclusion of a competitor from a standard-setting process is a violation of Section 1. *See, e.g., Allied Tube v. Indian Head, Inc.*, 486 U.S. 492, 509-11 (1988) (reversing j.n.o.v. based on Noerr-Pennington defense after verdict finding petitioner and others violated Sherman Act § 1 by boycotting competitors during the standard-setting process). And courts have denied motions to dismiss antitrust claims based on defendants' abuse of a standard-setting process that allowed defendants to charge "exorbitant" licensing fees. *See Rsch. in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 794-96 (N.D. Tex. 2008).

### III. The CAC Adequately Pleads a Declaratory Judgment Claim

**Justiciability.** Defendants' argument that the CAC's claims are not justiciable ignores its allegations. In *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007), which Defendants cite, the Court announced the test to be applied, quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 (1941): "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." And the Court noted with approval that lower federal courts hold there is jurisdiction under the Declaratory Judgment Act "in situations in which the plaintiff's self-avoidance of imminent injury is coerced by *threatened* enforcement action of a private party," *MedImmune*, 549 U.S. at 130 (emphasis added; other emphasis removed). The CAC alleges that "Defendants extracted and continue to extract … 'license fees' by threatening CUSIP Users both with copyright infringement litigation and with loss of access to the CUSIP numbers if they do not sign the license agreement," CAC ¶ 10, citing the examples of plaintiffs Swiss Life, *id*. ¶¶ 101, 108, and Hildene Capital, *id*. ¶¶ 102-03, 105-07, as well as Xignite, *id*. ¶¶ 78, 89, and members of the Investment Adviser Association ("IAA"), *id*. ¶ 98. Defendants' assertion that the threats concerned only the so-called CGS Data compilation and not CUSIP numbers is belied by the actual allegations: "The client [Swiss Life] is failing to acknowledge that *CUSIP data* is our intellectual property and therefore in the event of misappropriation or misuse we have the right to seek injunctive relief" (*id*. ¶ 101; emphasis added). *See also* the IAA's May 17, 2021, letter to the SEC's Gary Gensler (*id*. ¶ 98) stating that "S&P [was] threatening to freeze [the IAA's] ability to maintain CUSIP numbers in their databases"). There is thus unquestionably an actual, justiciable controversy.

**Restitution Is an Available Remedy**. Once a declaratory judgment has been issued, this Court may order any "further necessary or proper relief" based on that judgment. 28 U.S.C. § 2202. Further relief may include an award for damages. *Beacon Const. Co. v. Matco Elec. Co.*, 521 F.2d 392, 399–400 (2d Cir. 1975). "In deciding whether to award damages or require the parties to engage in further litigation the determinative factor is which solution will result in the most expeditious and just conclusion of the controversy." *Id.*

Defendants argue, prematurely, that restitution of "copyright" license fees improperly charged to the class would not be an appropriate remedy if a judgment is issued declaring that CUSIP numbers are not copyrightable. Defendants rely on cases that hold a licensee may not recover royalties paid prior to the date of a challenge to a *patent* subsequently found to be invalid. However, the rationale for the rule is that "the prospect of refunding all royalties collected would constitute such a cloud over a licensed patent that patenting would be discouraged." *Zenith Labs, Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 513 (3d Cir. 1976). Thus, courts have made a policy decision that where the patent office has issued a patent, allowing good-faith patent holders to have security in their rights outweighs allowing full redress to licensees after a finding of invalidity. Here, however, *copyrights* are not issued after review by any government agency, and Plaintiffs paid license fees on CUSIP numbers that were never copyrighted and are not copyrightable. There is no policy rationale that would support allowing Defendants to retain fees so procured. Restitution is a recognized remedy under such circumstances. *See generally Good Morning to You Prods. Corp. v. Warner-Chappell Music, Inc.*, 2013 WL 12138670, at *1 (C.D. Cal. Oct. 16, 2013) (describing further relief requested in connection with a declaration that the song "Happy Birthday" had passed into the public domain and was no longer copyrighted or copyrightable).

### IV. The CAC Adequately Pleads Breach of Contract and State Law Claims

Defendants' only purported ground for dismissal of the breach of contract claim is the CAC's supposed failure to allege facts showing a promise to charge CUSIP license fees (to the extent permissible to charge such fees at all) on a FRAND basis. Defendants ignore the allegation that S&P/FactSet described in its licensing fee policy that it "seeks to charge fair, reasonable and non-discriminatory license fees." CAC ¶¶ 57, 135, 230. Defendants' *own* admission in their *own* policy contradicts their position that the FRAND promise only applies to "patent rights." Def. Ltr. 3. Additionally, Defendants' suggestion that Plaintiffs must allege an intentionally false promise that induced the adoption of a standard to establish a misuse of market power is mistaken because Plaintiffs' FRAND claims are breach of contract claims that require no such showing. CAC ¶¶ 27, 133-38, 227-34; *TCL Communs. Tech. Holdings, Ltd. v. Telefonaktenbologet LM Ericsson*, 2014 U.S. Dist. LEXIS 197559, at *11-13 (C.D. Cal. Sep. 30, 2014) (describing elements of a FRAND breach of contract claim). Finally, Defendants make no specific arguments regarding the CAC's unfair business practices claims.

        Respectfully submitted,

/s/ *Ronald J. Aranoff*
R. Scott Thompson
Ronald J. Aranoff
Ryan A. Kane
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue, 12th Floor
New York, NY 10110
Telephone: (212) 382-3300
Email: sthompson@wmd-law.com
raranoff@wmd-law.com
rkane@wmd-law.com

/s/ *Leiv Blad*
Leiv Blad
Jeffrey Blumenfeld
Meg Slachetka
COMPETITION LAW PARTNERS PLLC
1101 Pennsylvania Ave., NW
Washington, DC 20004
Telephone: (202) 742-4300
Email: leiv@competitionlawpartners.com

/s/ *Robert N. Kaplan*
Robert N. Kaplan
Gregory K. Arenson
Elana Katcher
KAPLAN FOX & KILSHEIMER LLP
850 Third Ave., 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Email: rkaplan@kaplanfox.com