# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DINOSAUR FINANCIAL GROUP LLC<br>470 Park Avenue South, Ninth Floor<br>New York, NY  10016 | ) ) ) | |
| | ) | |
| HILDENE CAPITAL MANAGEMENT, LLC<br>333 Ludlow Street, Suite 5<br>Stamford, Connecticut 06903 | ) ) ) | |
| | ) | |
| SWISS LIFE INVESTMENT<br>MANAGEMENT HOLDING AG<br>General-Guisan-Quai 40<br>P.O. Box. 8022 Zurich, Switzerland | ) ) ) ) | |
| | ) | |
| on behalf of themselves and all others<br>similarly situated, | ) ) | Civil Action Nos.: 1:22-cv-1860-KPF |
| | ) | 1:22-cv-1929-KPF |
| Plaintiffs, | ) ) | |
| | ) | |
| v. | ) | **SECOND AMENDED** |
| | ) | |
| S&P GLOBAL, INC.<br>55 Water Street<br>New York, NY  10041 | ) ) ) | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| | ) | |
| AMERICAN BANKERS ASSOCIATION<br>1120 Connecticut Ave., NW<br>Washington, DC  20036 | ) ) ) | |
| | ) | |
| FACTSET RESEARCH SYSTEMS INC.<br>45 Glover Avenue<br>Norwalk, CT  06850 | ) ) ) | |
| | ) | |
| Defendants. | ) ) ) ) ) ) | |

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE ........................................................................6

III.    THE PARTIES.....................................................................................................8

IV.     DEVELOPMENT OF THE CUSIP NUMBERING SYSTEM.........................10

V.      S&P ENLISTED THE THIRD-PARTY DATA VENDORS TO JOIN ITS PLOT TO IMPOSE ITS UNLAWFUL LICENSING SCHEME ON CUSIP USERS .....................12

   A.   S&P Changed Its Business Model from Subscription to a Licensing Scheme.................12

   B.   Third-Party Data Vendors Provide CUSIP Users with a Data Feed that Does Not Include the CUSIP_DB Compilation............................................................15

   C.   S&P Secured the Third-Party Data Vendors' Agreement to Boycott CUSIP Users Who Refused to Enter License Agreements with S&P .............................................16

   D.   S&P's Unlawful Agreements with Third-Party Data Vendors and with CUSIP Users Excluded All Competition and Innovation from the CUSIP Use Market ........................18

VI.     DEFENDANTS' LICENSING SCHEME HAS NO LAWFUL BASIS BECAUSE CUSIP USERS DO NOT COPY ALL OR SUBSTANTIALLY ALL OF THE CUSIP_DB COMPILATION ................................................................................19

VII.    DEFENDANTS FALSELY CLAIMED TO CUSIP USERS AND THE UNITED STATES GOVERNMENT THAT THE LICENSE WAS NECESSARY BECAUSE THE CUSIP NUMBERS ARE COPYRIGHTED ..................................................22

VIII.   DEFENDANTS THREATEN LITIGATION AND LOSS OF CUSIP NUMBERS IF A FINANCIAL INSTITUTION REFUSES TO SIGN A LICENSE....................................27

IX.     DEFENDANTS ALSO MANIPULATED THE STANDARD-SETTING PROCESS TO ELIMINATE THE REMOTE CHANCE THAT X9 WOULD ADOPT ANOTHER NUMBERING SYSTEM AS A STANDARD.................................................32

X.      IN THE ALTERNATIVE, IF CUSIP NUMBERS ARE FOUND TO BE PROTECTED BY COPYRIGHT, DEFENDANTS ARE VIOLATING THE ABA'S COMMITMENT TO X9 TO LICENSE ON FRAND TERMS ....................................................34

XI.     RELEVANT MARKET AND DEFENDANTS' MARKET POWER..............................37

XII.    CLASS ACTION ALLEGATIONS ..................................................................38

XIII.   THE ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT ......................42

XIV.   CLAIMS FOR RELIEF ..............................................................................47

**First Claim for Relief**
(On Behalf of the CUSIP User Class Against All Defendants)
Declaratory Judgment Under the Declaratory Judgment Act, 28 U.S.C. § 2201 and the United
States Copyright Act of 1976, 17 U.S.C. § 101 et seq..........................................................47

**Second Claim for Relief**
(On Behalf of the CUSIP User Class Against S&P and FactSet)
Monopolization in Violation of Section 2 of the Sherman Act, Unlawful Maintenance of
Monopoly Power...........................................................................................................48

**Third Claim for Relief**
(On Behalf of the CUSIP User Class Against All Defendants)
Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act .............................49

**Fourth Claim for Relief**
(On Behalf of the CUSIP User Class Against All Defendants)
Group Boycott in Violation of Section 1 of the Sherman Act......................................................50

**Fifth Claim for Relief in the Alternative**
(On Behalf of the CUSIP User Class Against All Defendants)
Breach of Contract ........................................................................................................51

**Sixth Claim for Relief**
(On Behalf of the New York Unfair Business Practices Sub-Class Against All Defendants)
Violations of New York General Business Law § 349(a) .....................................................52

**Seventh Claim for Relief**
(On Behalf of the Connecticut Unfair Business Practices Sub-Class Against All Defendants)
Violations of Connecticut Unfair Trade Practices Act § 42-110b(a) ....................................54

**Eighth Claim for Relief**
(On Behalf of the Injunctive Relief Class Against FactSet and the ABA)
Injunctive Relief...........................................................................................................55

PRAYER FOR RELIEF .......................................................................................56

JURY DEMAND ................................................................................................58

Plaintiffs Dinosaur Financial Group LLC, Hildene Capital Management, LLC, and Swiss Life Investment Management Holding AG (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by their attorneys, Competition Law Partners PLLC, Kaplan, Fox & Kilsheimer LLP, and Wollmuth Maher & Deutsch LLP, for their Second Amended Complaint ("SAC") in this action hereby state the following:

## I.   INTRODUCTION

1.     Defendant S&P Global, Inc. ("S&P") for decades unlawfully maintained a monopoly and conspired with the American Bankers Association ("ABA") to successfully eliminate competition in the market for using identifiers for United States financial instruments (the "CUSIP Use Market"). The Defendants have employed a variety of exclusionary acts, many of which share a common theme: they are based on the false assertion that CUSIP numbers are protected by copyright. Numbers, including numbers used for identification, are not copyrightable.

2.     CUSIP numbers are the standard numbering system for United States financial instruments. Defendants have leveraged the CUSIP numbers' status as the standard to coerce financial institutions, whose businesses depend on the use of CUSIP numbers, to pay Defendants a "tax" for the use of CUSIP numbers.

3.     CUSIP is an acronym that stands for Committee on Uniform Securities Identification Procedures. As its name implies, a CUSIP number is a functional "serial number" to identify a particular financial instrument. CUSIP numbers identify financial instruments just as social security numbers identify persons or Vehicle Identification (VIN) numbers identify cars.

4.     Each CUSIP number is merely a nine-digit number that identifies a specific United States financial instrument. A CUSIP number specifies both the name of the issuing entity and the type of issue (*i.e.*, whether the issue is a debt or equity instrument). Each individual CUSIP number

results not from any artistic, literary, or other aesthetic or subjective consideration or authorship or creativity. Instead, a convention established more than 50 years ago strictly determines the set format of each CUSIP number and each digit within it. The following chart describes the rigid, invariable structure of a CUSIP number:



5.      The ABA claims to "own" the CUSIP numbering system, and it delegated the management of the CUSIP numbering system to S&P. The ABA claims to own a copyright based on a copyright registration it filed for a "compilation" of data that includes the CUSIP number and data for every financial instrument which has an associated CUSIP number. According to the

Defendants, the data compilation contains more than 60 data elements on more than 26 million financial instruments (the "CUSIP_DB").

6.      Three of the data elements in the CUSIP_DB compilation are: (i) the CUSIP numbers, (ii) the issuer name, and (iii) the type of issue. The first element—CUSIP numbers—are not copyrightable as a matter of copyright law because they lack the originality and creativity that is a constitutional and statutory requirement for copyright protection. The second and third elements—the issuer's full name and the type of issue—are set by the issuer; therefore, Defendants have no claim of authorship or originality or copyright in the issuer's name and type of issue.

7.      Within S&P, the CUSIP Global Services ("CGS") division was responsible for managing the CUSIP issuance and licensing business ("CGS Business") on behalf of the ABA until March 1, 2022. On that date, FactSet Research Systems, Inc ("FactSet") purchased the CGS Business from S&P for $1.925 billion and assumed its liabilities through an asset purchase agreement. FactSet also entered into an agreement with S&P and the ABA by which FactSet took over from S&P the licensing and administration of the CUSIP numbering system on behalf of the ABA.

8.      Decades ago, the ABA established the X9 Standards Committee ("X9") which appointed the CUSIP numbering system as the standard identifier for U.S. financial instruments. The ABA owned X9 for decades and still controls X9, continually appointing CUSIP as the standard.

9.      Banks, investment funds, public employee pension funds, fund managers, and other financial institutions ("CUSIP Users"), both in the United States and abroad, need CUSIP numbers to process, clear, and settle trades and to conduct research and analysis. Thus, CUSIP Users must have in their data feeds the CUSIP numbers, as well as the associated issuer name and the type of

financial instrument, to operate their businesses. Plaintiffs and members of the Class[1] are CUSIP Users. Defendants have leveraged CUSIP numbers' position as the standard to exploit financial institutions whose business depends on the use of CUSIP numbers. Although Defendants have no legal basis for demanding that CUSIP Users take a license as a condition for using CUSIP numbers, the issuer name, and the type of issue, Defendants force CUSIP Users to enter so-called "license" agreements on the threat that they will lose access to the CUSIP numbers, which would cripple the CUSIP Users' businesses. Having no real option, CUSIP Users have entered into license agreements with S&P and FactSet, which extend the grant in the ABA's compilation copyright far beyond its legal boundary.

10.     The license agreements preclude any unauthorized use, including any commercial use, of CUSIP numbers. This eliminates potential innovation and competition from CUSIP Users, helping to maintain Defendants' 100% share in the CUSIP Use Market.

11.     Defendants attempt to justify their anticompetitive conduct as enforcing the ABA's compilation copyright, but that copyright protects only the compilation itself exactly as it is arranged and maintained on formerly S&P's and now FactSet's servers. The copyright does not protect any of the data in the compilation, and the only way a CUSIP User can violate the copyright is to copy all or substantially all of the entire compilation in the form and arrangement in which it is maintained on Defendants' servers.[2] Yet, CUSIP Users do not want, receive, use, or copy all or substantially all of the compilation.

12.     As a result of Defendants' illegal conduct, Plaintiffs, on behalf of themselves and all others similarly situated, assert the following claims:

---

[1]  "Class" as used herein refers to members of the "CUSIP User Class," defined below.

[2]  Each reference to "all or substantially all of the compilation" and to "all or substantially all of CUSIP_DB compilation" should be understood to include the qualifier "in the form and arrangement in which it is maintained on Defendants' servers."

13.     **Declaratory Judgment**. A declaratory judgment that CUSIP numbers are not copyrightable and that the ABA has no valid copyright claim on CUSIP numbers is ripe for decision now since, as described below, Defendants have threatened legal action and other business harm to Plaintiffs based on false copyright claims.

14.     **Violations of Section 2 of the Sherman Act**. S&P willfully and unlawfully maintained (and FactSet is maintaining) a monopoly in the CUSIP Use Market through the exercise of its market power and its exclusionary conduct. The ABA and S&P (and now FactSet) conspired to maintain S&P's (and now FactSet's) monopoly power by engaging in exclusionary conduct, including for example through exclusionary contractual agreements, a group boycott, and manipulating the standard-setting process, that prevented competition and innovation in the CUSIP Use Market. As a result of this conduct, CUSIP Users were deprived of the benefits of innovation and robust competition in the CUSIP Use Market and were forced to enter "license agreements" with S&P (and now FactSet) and pay unlawful and unfair fees.

15.     **Violations of Section 1 of the Sherman Act**. Defendants conspired to restrain competition in the CUSIP Use Market. Among other conduct, Defendants agreed with Third-Party Data Vendors (defined below) to boycott CUSIP Users that refused to enter into license agreements with S&P (and now FactSet) and implemented that agreement through written agreements prohibiting Third-Party Data Vendors from distributing CUSIP numbers to any CUSIP User that refused to enter a license agreement with S&P (and now FactSet).

16.     **Unfair Business Practices**. Defendants have engaged in purposeful, deceitful, and misleading monopolistic conduct to ensure control over the CUSIP Use Market by, among other things, falsely claiming "license agreements" were necessary to use CUSIP numbers and threatening that CUSIP Users will be unable to access essential data from Third-Party Data

Vendors and will be subject to copyright infringement claims unless they enter "license agreements." This conduct violates Section 349 of the New York General Business Law and Section 42-110b of the Connecticut Unfair Trade Practices Act.

17. **Breach of Contract**. If, contrary to law, CUSIP numbers are found to be copyrightable, then, in the alternative, Defendants breached the ABA's commitment that, as a condition to X9 designating the CUSIP numbering system as the standard, the ABA would license use of the CUSIP numbering system on fair, reasonable and non-discriminatory ("FRAND") terms. Plaintiffs and members of the Class are intended third-party beneficiaries of the agreement between the ABA and X9. At a minimum, Defendants breached the ABA's FRAND agreement by coercing CUSIP Users to pay fees for the use of CUSIP numbers that do not comply with the FRAND commitment.

18. **Additional Injunctive Relief**. Plaintiffs, individually and on behalf of the Injunctive Relief Class (as defined below) also seek injunctive relief to enjoin the ABA's and FactSet's continued anticompetitive and unfair conduct alleged herein. This ongoing unlawful conduct threatens to continue to injure Plaintiffs and members of the Injunctive Relief Class through the continued payment of annual fees for existing "license agreements" and demands to renew or enter new exclusionary "license agreements."

## II.   JURISDICTION AND VENUE

19. This is an action: (a) for declaratory judgment under 28 U.S.C. §§ 2201, 2202 arising, in part, under the United States Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act"); (b) for injunctive relief and damages under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 4 of the Clayton Act, 15 U.S.C. § 15(a); (c) for damages for violations of New York General Business Law § 349(a); (d) for damages for violations of

Connecticut Unfair Trade Practices Act § 42-110b(a); and (e) in the alternative, if the CUSIP numbers are copyrighted (which they are not), for damages for breach of contract. As to monetary relief, this action seeks to recover threefold damages, costs of suit, and reasonable attorneys' fees.

20.     This Court has original jurisdiction of these claims under 28 U.S.C. §§ 1331, 1337, and 1338 and Section 4 of the Clayton Act, 15 U.S.C. § 15.

21.     This Court has subject matter jurisdiction over this matter pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, and the Copyright Act.

22.     The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 because these claims form part of the same case or controversy as the federal claims asserted herein.

23.     Defendants' conduct, as described herein, was within the flow of, and was intended to and did have a substantial effect on, the interstate commerce of the United States, including in this District. During the relevant period, each Defendant used the instrumentalities of interstate commerce to join or effectuate their scheme. The Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

24.     Defendants engaged in conduct in the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

25.     This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, and committed overt acts in furtherance of its illegal scheme throughout the United States, including in this District. The scheme has been directed at, and has had the intended effect of, causing injury to Plaintiffs and persons and entities residing in, located in, or doing business in this District, the United States and its territories, and

the District of Columbia. The license agreements at issue provide that jurisdiction is exclusive to the state and federal courts in New York, New York.

26.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400 and Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22) because each Defendant resides, transacts business, is found, or has agents within this District, and because a substantial part of the alleged events giving rise to the claims occurred, and a substantial portion of the affected interstate trade and commerce described below was carried out, in this District. As stated above, the license agreements at issue provide that jurisdiction is exclusive to the state and federal courts in New York, New York.

## III.    THE PARTIES

27.     Dinosaur Financial Group LLC ("Dinosaur") is a financial institution based in New York. It provides investment banking, institutional brokerage, and wealth management services. Dinosaur entered into a license agreement with S&P and paid license fees directly to S&P in New York. The negotiations occurred in New York, the agreement is governed by New York law, and jurisdiction is exclusive to the federal and state courts in New York, New York.

28.     Hildene Capital Management, LLC ("Hildene") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Connecticut. It is a diversified institutional asset manager specializing in assets based on credit opportunities. Hildene entered into a license agreement with S&P and paid license fees directly to S&P in New York. The negotiations occurred in New York and Connecticut, the agreement is governed by New York law, and jurisdiction is exclusive to the federal and state courts in New York, New York.

29.     Swiss Life Investment Management Holding AG ("Swiss Life") is a Switzerland-based holding company and through its fund and asset management companies is a provider of portfolio management services for institutional investors. Swiss Life entered into a license agreement with S&P and paid license fees directly to S&P in New York. That agreement, and the relationship between Swiss Life and S&P established by the license agreement, is governed by New York law and jurisdiction is exclusive to the federal and state courts in New York, New York.

30.     Defendant ABA is a trade association for the United States banking industry organized under Section 501(c)(6) of the Internal Revenue Code. It is headquartered in the District of Columbia.

31.     S&P is a provider of financial data and data analytics. It is headquartered in New York, New York.

32.     CGS was a division of S&P located in New York, New York until March 1, 2022 when FactSet purchased the CGS Business. Since March 1, 2022, CGS has been owned by FactSet. The CGS Business was operated on behalf of the ABA by S&P and its subsidiaries until March 2022 and is now operated on behalf of the ABA by FactSet.

33.     FactSet is a provider of financial data and a financial data analytics company. It is headquartered in Norwalk, Connecticut, and maintains an office in this District. Under the Asset Purchase Agreement ("APA") between S&P and FactSet, FactSet assumed and agreed to pay, discharge, or perform the liabilities of S&P and its affiliates to the extent related to or arising out of what the APA defined as the "CGS Business."[3] In addition, under a Novation Agreement entered into among S&P, FactSet, and the ABA, the ABA consented to FactSet's purchase of the

---

[3]  The APA defined "CGS Business" as "the CUSIP issuance, data licensing and portfolio services businesses, as currently carried out by CGS, which Seller and its Subsidiaries operate on behalf of the ABA pursuant to the ABA Agreement, the issuance and data licensing of other related identifiers … as currently carried out by CGS."

CGS Business from S&P, and FactSet agreed to assume all of S&P's obligations to the ABA under the CGS Business license agreement with the ABA. Thus, upon its acquisition of the CGS Business, FactSet became both the beneficiary of S&P's and the ABA's illegal conduct and liable for it, as well as a participant in that illegal conduct. FactSet is continuing that illegal conduct.

## IV.   DEVELOPMENT OF THE CUSIP NUMBERING SYSTEM

34.   Electronic trading systems require a standardized method for identifying financial instruments to facilitate the clearing and settlement of trades and other transactions. The standardized method must ensure that each financial instrument has a unique identifier that electronic trading systems can read and process. CUSIP numbers are unique identifiers, constituting the standard numbering system for trading in all United States financial instruments.

35.   The CUSIP numbering system was the product of a years-long industry-wide voluntary cooperative effort to develop a standard for identifying United States financial instruments. In the 1960s, government regulators, stock exchanges, and private firms recognized the need for such a standard because the then-new—but already rapidly growing number of—electronic systems managing the clearing and settlement of trades had no efficient way to identify a particular financial instrument. Verbal descriptions could not serve that function because any variation from one party's expression to another's—such as the use by one of abbreviations rather than whole words, or the use of different abbreviations for the same word—would cause the electronic systems (at least at the time and for many years thereafter) to fail to recognize all such descriptions as identifying the same instrument.

36.   To remedy this shortcoming, representatives of the Securities and Exchange Commission ("SEC"), the New York Stock Exchange ("NYSE"), the American Stock Exchange, the National Association of Securities Dealers, the Association of Stock Exchange Firms, the

Investment Bankers Association, the ABA, and many financial institutions worked to develop a numbering identification system to speed up the clearing and settlement of securities transactions in a committee formed for that purpose—the Committee on Uniform Security Identification Procedures (the "CUSIP Committee").

37.     Beginning in 1964, the CUSIP Committee coordinated the development of a numbering system and the creation of an entity to manage the real-time listing of CUSIP numbers. The CUSIP Committee completed the development of the CUSIP numbering system in 1966. The numbering system was introduced to the financial markets in 1968 as the *de facto* standard in United States financial markets. Shortly after the ABA announced the development of the CUSIP numbering system, it created the CUSIP Service Bureau ("CSB"), the predecessor to CGS, to administer the CUSIP numbering system. Later that year, the ABA selected S&P to operate and manage CSB/CGS, which became a division of S&P. This arrangement lasted through March 1, 2022, when S&P sold CGS to FactSet.

38.     On March 3, 1971, the SEC began using CUSIP numbers in its electronic data processing systems related to certain reporting forms, securities analyses, and the publication of certain directories.

39.     In 1971, the SEC required the use of CUSIP numbers on Form 3, the Initial Statement of Beneficial Ownership of Securities, and Form N-1R, a form for filing annual reports by investment management companies. In 1972, all clearing corporations begin using CUSIP numbers, making them the mandatory identifier for all brokerage firms. In 1975, The Federal Reserve Bank's automated book entry system began using CUSIP numbers to accelerate the transfer of United States Treasury Securities.

40.     In 1974, several years after granting an exclusive license to S&P's CSB/CGS, the ABA established X9, which is an Accredited Standards Developer of the American National Standards Institute ("ANSI"). The ABA established X9 to develop and review standards for the United States financial services industry. At the time, there was no alternative numbering system to the CUSIP numbers, and X9 obtained approval from ANSI to adopt formally the CUSIP numbering system as the market standard for identifying financial instruments traded on United States financial markets. In 1976, the ABA-controlled X9 ratified its 1974 adoption of the CUSIP numbering system as the national standard for identifying financial instruments.

41.     CUSIP numbers also are an integral element of International Securities Identification Numbers ("ISINs"), which are 12-character numeric codes that identify United States financial instruments traded on markets outside the United States. ISINs are created by adding digits to the CUSIP numbers. Any entity outside the United States that trades the stock of a United States company on a foreign exchange must use CUSIP numbers as a core element of the ISIN that identifies that company's financial instruments.

42.     Regardless of any requirements to use CUSIP numbers in regulatory filings or otherwise, no government agency, including the Department of the Treasury and the SEC, regulates the CUSIP Use Market, nor does any government agency regulate the rates and terms charged by CGS for any of its CUSIP-related activities.

## V.     S&P ENLISTED THE THIRD-PARTY DATA VENDORS TO JOIN ITS PLOT TO IMPOSE ITS UNLAWFUL LICENSING SCHEME ON CUSIP USERS.

### A.     S&P Changed Its Business Model from Subscription to a Licensing Scheme.

43.     For many years after the CUSIP numbering system was formed in 1968, S&P operated a dependable "utility" business distributing CUSIP numbers in physical books to financial institutions. The books contained a limited amount of information about each financial

instrument that was linked to a CUSIP number: the issuer number, issuer name, issue name, and CUSIP number.

44.     S&P sold the books on a subscription model and issued paper updates to the books throughout the year. At the end of each year, S&P required that subscribers return the books and paper updates, after which the subscribers would receive the next year's book and subsequent updates. Under this physical distribution model, S&P was able to control the dissemination of the CUSIP numbers after issuance merely by controlling the physical books, and thereafter the CD-ROMs that later replaced the books.

45.     However, in the 1980s, Bloomberg LP ("Bloomberg") began to distribute electronically rich sets of financial market data, including CUSIP numbers, directly to CUSIP Users, on a subscription model. Bloomberg's innovation disintermediated the direct contractual relationship S&P had enjoyed with CUSIP Users in the distribution of CUSIP numbers and threatened the monopoly that S&P had enjoyed for more than a decade. Bloomberg's distribution of CUSIP numbers directly to CUSIP Users meant that the CUSIP Users obtained and could use the CUSIP numbers, the issuers' names, and the types of issues without paying a fee to S&P. Other data companies, including Reuters (which became Thomson Reuters and is now Refinitiv), S&P, and FactSet later followed Bloomberg's lead in distributing their data electronically.

46.     S&P and FactSet refer to data vendors such as Bloomberg as "Third-Party Data Vendors," to distinguish them from S&P and FactSet, which also are data vendors and compete with Bloomberg and other Third-Party Data Vendors. S&P's Market Intelligence business generated subscription revenue from the "distribution of data, analytics, third-party research, and credit ratings-related information…." S&P Global, Inc., Annual Report (Form 10-K) at 7 (Feb. 8, 2022). Similarly, FactSet "is a global financial data and analytics company" that "provide[s]

financial data and market intelligence on securities, companies, industries, and people…." FactSet Research Systems, Inc., Annual Report (Form 10-K) at 5 (Oct. 21, 2022).

47.     To reassert control over the use of CUSIP numbers, to ensure that it would face no competition in the CUSIP Use Market, and to reap even higher revenue, S&P scrapped the historical subscription model in favor of a "license" model. Because it could not charge subscription fees to CUSIP Users—who received data from Third-Party Data Vendors, not from S&P—S&P demanded that CUSIP Users sign a so-called "license" and pay so-called "license fees" even though CUSIP Users did not receive the CUSIP_DB compilation. These license agreements restricted CUSIP Users' use of CUSIP numbers by preventing CUSIP Users from collecting and distributing CUSIPs or using them commercially.

48.     S&P leveraged the CUSIP numbers' status as the standard by claiming that the license related to data maintained in the CUSIP_DB compilation over which S&P claimed copyright protection. The CUSIP_DB compilation is not a collection of financial market data relating to financial instruments like that published in *The Wall Street Journal*. Rather, it is a compilation of data about each financial instrument that was relevant to linking the CUSIP number to that specific financial instrument at the time the CUSIP number was issued. According to FactSet, in addition to the CUSIP number, the issuer name, and the type of issue, the CUSIP_DB compilation includes in a particular arrangement the following data fields for equity issues: "Activity Date, ADR Program Type, Auditor, CFI Codes (ISO and U.S.), Currency, Depository Eligible Indicator, Domicile, Exchange Traded (Multiple Tickers/Exchanges), Financial Advisor, Form, Fund (Open/Closed End, Investment Policy, Income Distrib. Policy – Load/No Load), Initial Public Offering Indicator Issue Status, Ownership Restrictions Payment Status, Ticker

Symbol (Multiple Tickers/Exchanges), Type of Preferred Dividend Income, Underwriter, and Warrant (Type, Underlying Assets, Call/Put Indicator)."

### B. Third-Party Data Vendors Provide CUSIP Users with a Data Feed that Does Not Include the CUSIP_DB Compilation.

49.     The Third-Party Data Vendors' data feeds are the means by which they deliver data directly from their servers to the CUSIP Users' computer systems. It is critical that the data feeds contain the CUSIP numbers, issuer names, and types of issue because the Third-Party Data Vendors use those data elements to link their data to particular financial instruments. If the data feeds did not contain the CUSIP numbers, issuer names, and types of issue, CUSIP Users would receive nothing but a jumble of worthless, unorganized data that their electronic systems could not process.

50.     The Third-Party Data Vendors' data feeds are different and separate from the CUSIP_DB compilation. The Third-Party Data Vendors' data feeds contain data about the financial instrument after it is issued. As an example, Bloomberg's data feed includes: (a) "independent research from more than 1,500 sources, as well as proprietary research on industries, markets, companies and countries from Bloomberg's research teams;" (b) "breaking headlines, exclusive global coverage, structured financial data, news analytics and global economic indicators;" (c) "real-time market data;" (d) "pricing across every asset class;" and (e) regulatory data sets that help financial institutions satisfy current regulations and prepare for upcoming regulatory requirements.

51.     Thus, the Third-Party Data Vendors do not re-route the CUSIP_DB compilation to CUSIP Users. The Third-Party Data Vendors include only some of the data that is also in the CUSIP_DB compilation in the customized set of data items they provide to CUSIP Users based

on each CUSIP User's idiosyncratic data needs, due to each CUSIP User's investment strategy, risk profile, and investor client base.

### C. S&P Secured the Third-Party Data Vendors' Agreement to Boycott CUSIP Users Who Refused to Enter License Agreements with S&P.

52.     CUSIP Users who received their data feed from Third-Party Vendors understandably saw no need to enter into license agreements with S&P because they were not receiving CUSIP numbers or any other data from S&P.

53.     S&P broke this resistance to the new licensing scheme by agreeing with the Third-Party Data Vendors to a boycott of any CUSIP User that refused to enter a license with S&P—even if the CUSIP User did not receive the entire CUSIP_DB compilation and merely accessed CUSIP numbers as part of data feeds from Third-Party Data Vendors.

54.     S&P and the Third-Party Data Vendors agreed to insert into the Third-Party Data Vendors' contracts with CUSIP Users clauses that required the Third-Party Data Vendors to remove the CUSIP numbers from the Third-Party Data Vendors' data feeds to any CUSIP User that did not enter into a license agreement with S&P. S&P was able to secure this agreement with the Third-Party Data Vendors because S&P controlled and abused CUSIP's position as the *de facto* standard.

55.     The agreement between S&P and the Third-Party Data Vendors thus was not designed to protect S&P's copyright-protected data compilation because CUSIP Users do not receive the CUSIP_DB compilation. Instead, it was an agreement to ensure that S&P could impose a license from S&P on CUSIP Users to collect a toll from the mere use of CUSIP numbers and to preclude CUSIP Users from competing in the CUSIP Use Market. The end result of this group boycott has been that CUSIP Users must pay a license fee to S&P (and now FactSet) even if they do not receive the CUSIP_DB compilation, or they run the risk of having essential CUSIP numbers stripped from their data feeds from Third-Party Data Vendors.

56.     It was widely known in the industry that the Third-Party Data Vendors agreed to boycott CUSIP Users who refused to enter license agreements with S&P. And S&P openly acknowledges that it included these restrictions in its contracts with all Third-Party Data Vendors. For example, in January 2021, S&P informed Hildene that "CGS's agreements with its ISPs[4] do not allow such ISPs to distribute CGS Data to firms in bulk or downloadable format unless such firms are properly licensed by CGS" and that "CGS has the contractual right to require applicable ISPs to cease distribution of CGS Data in bulk, datafeed or downloadable format to those firms who refuse to sign an appropriate CGS license agreement." The restriction is not related to copying all or substantially all of a compilation, but rather applies to any access to CUSIP numbers in a data feed or downloadable format from the Third-Party Data Vendors.

57.     Thus, the Third-Party Data Vendors knew that all other Third-Party Data Vendors were also agreeing to the group boycott orchestrated by Defendants. Specifically, Third-Party Data Vendors knew that S&P, itself a data vendor, was requiring the other Third-Party Data Vendors, which competed with S&P and with each other, to enter into an agreement containing these restrictions.

58.     The threat that a refusal to sign a license with S&P (and now FactSet) would cause the Third-Party Data Vendors to remove the CUSIP numbers, issuer names, and types of issue from the Third-Party Data Vendors' data feeds has posed an existential threat to the business of any CUSIP User that did not sign the license agreement. Because a functioning data feed is a necessary tool for CUSIP Users' business, refusing to sign a license agreement would bring a CUSIP User's business to a halt.

---

[4] CGS defined ISPs as "information service providers" such as Bloomberg and/or Thomson Reuters—the equivalent of Third-Party Data Vendors.

59.     The result is that CUSIP Users have had no choice but to sign license agreements with S&P (and now FactSet). Thus, the agreement among S&P (and now FactSet) and the Third-Party Data Vendors to require CUSIP Users to enter into license agreements with, and pay so-called "license fees" to, S&P (and now FactSet) under the threat of losing access to CUSIP numbers, issuer names, and types of issues is a group boycott.

**D.     S&P's Unlawful Agreements with Third-Party Data Vendors and with CUSIP Users Excluded All Competition and Innovation from the CUSIP Use Market.**

60.     As a result of S&P's agreements with Third-Party Data Vendors, S&P excluded all potential competitors from, and all competition and innovation in, the CUSIP Use Market. S&P thereby earned hundreds of millions of dollars in monopoly rents disguised as "license fees."

61.     By re-establishing its control over the use of CUSIP numbers in the market after issuance, S&P foreclosed an avenue for potential competition in the CUSIP Use Market and foreclosed the innovation that otherwise would have arisen organically in how CUSIP numbers could be used. As one example of such potential competition, an unlicensed financial institution or fintech company could offer CUSIP Users a value-added service by gathering CUSIP numbers from numerous sources and using the CUSIP numbers to link data and information about financial instruments.

62.     One company did just that. Xignite, Inc. is a provider of cloud-based market data distribution and management solutions for financial services and technology companies. It gathered CUSIP numbers from sources independent of S&P, but because it had signed a license agreement, S&P forced Xignite to destroy its inventory of CUSIP numbers because Xignite's intended use was an unauthorized, commercial use under the license agreement. S&P thereby eliminated Xignite as a competitor in the CUSIP Use Market and denied CUSIP Users of the benefit of a new service.

63.     S&P's license forecloses competition and innovation in the CUSIP Use Market because its terms prohibit any commercial use of the CUSIP numbers and all uses not authorized by the Defendants.

## VI.     DEFENDANTS' LICENSING SCHEME HAS NO LAWFUL BASIS BECAUSE CUSIP USERS DO NOT COPY ALL OR SUBSTANTIALLY ALL OF THE CUSIP_DB COMPILATION.

64.     The ABA owns a copyright that purports to protect the CUSIP_DB compilation. Copyright #TX-614-6660 is titled "CUSIP_DB," and it claims authorship of "additions and rev. compilation of database material." Copyright #TX-614-6660 does not claim authorship of the CUSIP numbers because the CUSIP numbers are not copyrightable.

65.     S&P claimed and FactSet now claims that the CUSIP_DB compilation contains as many as 60 data elements for each of more than 26 million financial instruments.

66.     Copyright #TX-614-6660 is, as its title and claim of authorship make clear, a compilation copyright. Section 103 of the Copyright Act provides that a compilation copyright protects only the selection and arrangement of the data compilation as it resides on a fixed media of expression, here a computer server. A compilation copyright does not protect the data in the compilation, and the only way a user can infringe the compilation copyright is by copying all or substantially all of the compilation exactly as it is arranged on the computer server. A user does not infringe a compilation copyright by accessing, using, or even copying some of the data in the compilation. Nor does a user infringe a compilation copyright by rearranging all of the data in the compilation, combining it with other data, and then exploiting its own rearranged database.

67.     CUSIP Users do not want, receive, use, or copy the CUSIP_DB compilation, which is the only asset the ABA has the right to protect by requiring a license.

68.     The "license" is contained in a CUSIP Global Services Subscription Agreement (the "Subscription Agreement"). The standard Subscription Agreement states that S&P, now FactSet, "pursuant to an exclusive agreement with the [ABA], owns or has the right to license all proprietary rights to the CUSIP* database ('CUSIP Database'), which contains CUSIP* standard number, CUSIP* standard descriptions and other information about financial instruments ('Data')."

69.     The license states that it grants to the CUSIP User "a non-exclusive, non-transferable, limited license to access and use the proprietary CGS Service ('the Service') described in the applicable Service Attachment(s) attached hereto and incorporated herein in accordance with this Agreement." The "Service" and the scope of the license the CUSIP User takes depends on the particular option the CUSIP User selects from a menu of options set forth in the Services Attachment.

70.     The Services Attachment gives the CUSIP User the option to receive the entire CUSIP_DB compilation. The other options offer only the right to receive and use a subset of the data in the CUSIP_DB compilation. The number of options increased over time as S&P amended its license agreements, but the basic choice remained the same: the financial institution could receive the entire CUSIP_DB compilation or just a subset of the compilation.[5]

71.     In the unlikely event that a financial institution voluntarily entered into a direct license for the full CUSIP_DB compilation, that financial institution is not a member of the CUSIP User Class.

72.     Every other licensing option in the Services Attachment offers financial institutions a subset of the data in the CUSIP_DB compilation. CUSIP Users select one of these lesser options.

---

[5] While S&P amended its license agreements over time, the key provisions referenced herein remained substantially identical.

Selecting one of these options makes it clear that CUSIP Users do not receive, and therefore cannot copy, all or substantially all of the CUSIP_DB compilation.

73.     Each of the three named Plaintiffs chose one of the lesser options.

74.     Because CUSIP Users do not license the CUSIP_DB compilation, the ABA's compilation copyright gives Defendants no intellectual property right in the data CUSIP Users receive from Third-Party Data Vendors. Defendants therefore have no legal basis to: (a) prohibit CUSIP Users from accessing those data elements or from using them in any manner; (b) demand that CUSIP Users enter the license as a condition to using the CUSIP numbers; or (c) demand that Third-Party Data Vendors remove the CUSIP numbers from the Third-Party Data Vendors' data feeds if a CUSIP User refuses to enter a license.

75.     CUSIP Users have been vocal for years about Defendants' tactics and efforts to coerce entry into unlawful license agreements. For example, the Bond Dealers of America ("BDA"), the Investment Adviser Association ("IAA"), and the Government Finance Officers Association of the United States ("GFOA"),[6] noted Defendants' "tactics regarding CUSIP fees" and the "rapidly increasing and non-transparent fee for use and redistribution of CUSIP identifiers." The industry groups explained that CUSIP fees "exert a chilling effect on market transparency and the free flow of information for investing, trading, accounting, risk management, and regulatory reporting." The industry groups described "ongoing efforts by [S&P's CGS] to levy

---

[6] These organizations include numerous members, such as McGuireWoods, RBC Capital Markets, Tradeweb, Inc., UBS Wealth Management, U.S. Bank N.A., Wells Fargo Securities, Allianz Global Investors, The Blackstone Group, BNY Mellon Investment Adviser, Inc., Charles Schwab Investment Management, LLC, Fidelity Institutional Asset Management, Franklin Advisers, J.P. Morgan Investment Management, PIMCO, Morgan Stanley Investment Management, Inc., and Vanguard Group.

a toll on the majority of securities transactions, statements, disclosures, and electronic searches that occur daily in the United States."[7]

## VII.   DEFENDANTS FALSELY CLAIMED TO CUSIP USERS AND THE UNITED STATES GOVERNMENT THAT THE LICENSE WAS NECESSARY BECAUSE THE CUSIP NUMBERS ARE COPYRIGHTED.

76.     Defendants could not plausibly claim that a license from S&P was necessary based on an assertion that the Third-Party Data Vendors distributed the CUSIP_DB compilation to CUSIP Users because the Third-Party Data Vendors do not distribute the compilation to CUSIP Users. So, the Defendants adopted a false narrative that the license was necessary because the CUSIP numbers are copyrighted.

77.     The ABA told the SEC explicitly that the CUSIP numbers are copyrighted. It did so for the purpose of influencing the SEC's rulemaking process.

78.     In early 2010, in the wake of the financial crisis of 2007 and 2008, the SEC was considering a rule requiring rating agencies to post additional information about companies paying those agencies for the issuance or maintenance of a credit rating. Each of the agencies' credit ratings would have to be identified by the CUSIP or ISIN number. In a February 2, 2010, letter to the SEC, the ABA stated its understanding of the purpose of the proposed rule: "The purpose of the proposed rule is to provide users of credit ratings with information to assist them in evaluating the potential risk to the integrity of the credit rating that arises from the conflict inherent when a [rating agency] is paid to determine a credit rating for a specific obligor, security, or money market instrument."[8]

---

[7]   *See* Letter from BDA, IAA & GFOA to Mary Schapiro, Chairman, SEC (Nov. 10, 2010), https://www.bdamerica.org/wp-content/uploads/2010/12/CUSIP-SEC-Letter-FINAL-IAA-GFOA-BDA-111010.pdf.

[8]   *See* Letter from ABA to Elizabeth Murphy, Secretary, SEC (Feb. 2, 2010), https://www.sec.gov/comments/s7-28-09/s72809-9.pdf.

79.     In its February 2010 letter, the ABA represented to the SEC that the SEC could not adopt the proposed rule without the consent of the ABA because the ABA's copyright prevented ratings agencies from posting CUSIP numbers to their websites without a license from the ABA: "ABA retains the copyright in the selection and arrangement of data compiled in the [CUSIP_DB] data base *as well as in the CUSIP numbers themselves*." (emphasis added). The ABA pledged to change the terms of its licenses with the ratings agencies to permit the agencies to comply with the proposed regulation without infringing the ABA's copyright.

80.     The Defendants have represented to other financial regulators that CUSIP numbers are copyrighted. The Financial Industry Regulatory Authority ("FINRA") is a self-regulatory organization that regulates member broker-dealers. To create greater transparency in the over-the-counter trading of eligible fixed-income securities, FINRA created the Trade Reporting and Compliance Engine ("TRACE"). All FINRA member broker-dealers must report transactions in TRACE-eligible securities. FINRA created a "Trade Entry Screen" for member broker-dealers to report such transactions. The only information about the security on the Trade Entry Screen is the CUSIP number and the symbol.

81.     A developer of a software product seeking to integrate fixed-income securities reported in the TRACE system would need the Application Programming Interface ("API") files from FINRA for those securities. The API files contain the CUSIP numbers for each such security. With those API files, a developer could create a value-added software product that linked more data about each trade, thereby creating even more transparency to the over-the-counter trading of fixed-income securities. Yet, no developer can do so because the API files contain CUSIP numbers, and Defendants require a license agreement with S&P or FactSet as a condition to accessing the CUSIP number in the API files. FINRA repeats Defendants' requirement on its

website and will not release the API files unless the developer has a CUSIP license with S&P and now FactSet. And those licenses preclude software developers from using the CUSIPs in any unauthorized way or for commercial purposes.

82.     Defendants' restriction demonstrates conclusively that they require a license for the mere use of the CUSIP numbers, which could be justified only if the CUSIP numbers were copyrighted, which they are not.

83.     S&P made assertions and FactSet has asserted to financial institutions that refuse to sign a license that CUSIP numbers are copyrighted. Consistently and repeatedly, S&P informed financial institutions that a license was required for use of the CUSIP numbers, the issuer names, and the types of issues.

84.     S&P's standard Use of Service Statement explicitly states: "A license agreement is required when a user obtains access to an electronic data feed or bulk download of CUSIP, CINS, and CGS ISINs ("CGS Identifiers") and related descriptive data—either directly from CGS or indirectly through one of CGS' authorized data vendors/information providers ("Authorized Distributors"), *including when a user's database that contains CUSIP Identifiers and related descriptive data (including any outsourced databases) is updated, maintained and/or operated by an Authorized Distributor*" (emphasis added). This assertion—and misuse—of copyright makes no attempt to limit the claim to obtaining the entire CUSIP_DB compilation or to copying all or substantially all of the entire CUSIP_DB compilation.

85.     The misuse by S&P (and now FactSet) of the ABA's limited compilation copyright by claiming or implying that the ABA's copyright extends to the CUSIP numbers and to any "access" to or "use" of the CUSIP numbers is illustrated further by the CGS Use of Service Statement imposed by S&P (and now FactSet). The Use of Service Statement requires the

applicant to "describe in detail how [the] firm *uses CUSIP Identifiers* for its operations, and stores/maintains them (including any outsourced databases) (emphasis added)." S&P's license fees are based on the CUSIP Users' *use* of the *CUSIP numbers*, not on the Users' copying of the CUSIP_DB compilation.

86.     S&P has told CUSIP Users that a license is required for the use of the CUSIP numbers, regardless of whether the CUSIP User has copied the CUSIP_DB compilation. For example, in a January 5, 2021, letter to Hildene, Alison Romeo, a Manager of Licensing at S&P's CGS, referring to CUSIP numbers and ISINs, stated that "[f]irms *using* these identifiers internally (e.g., to support some of the processes described above), and/or that externally redistribute CGS Data must possess a license from CGS" (emphasis added). Ms. Romeo thus asserted that the mere use of the CUSIP numbers, even if internal to the financial institution, required a license from S&P. Ms. Romero's assertion was not limited to an assertion that a license was needed to permit Hildene to copy all or substantially all of the CUSIP_DB compilation.

87.     In a February 26, 2018, email to Dinosaur, Paul Mertz of S&P claimed that Dinosaur was required to enter into a license agreement because "proprietary CUSIP data is being *utilized* within your firm" (emphasis added). Dinosaur was receiving all its data from its own Third-Party Data Vendor and receiving no data from S&P, as Mr. Mertz knew. Therefore, any CUSIP numbers Dinosaur was "utilizing" did not come from S&P. Thus, Mr. Mertz could not have been clearer that a license agreement with S&P was required for the mere use of CUSIP data, meaning the CUSIP numbers, issuer names, and types of issue.

88.     In a June 5, 2012, letter to Swiss Life, Martin Richter, of S&P Capital IQ, confirmed that Swiss Life could not use the CUSIP numbers in its business if it failed to execute a license agreement. Mr. Richter stated that S&P would direct Swiss Life's Third-Party Data Vendor to cut

off access to the CUSIP numbers and ISINs: "I confirm that CUSIP Global Services will cease delivery of the CUSIP numbers and CSB ISINs if we do not have a re-filed 'Statement of Use' by June 15, 2012 and no signed contract by June 22, 2012." Mr. Richter made clear that this would apply "to all vendors, including Bloomberg."

89.    Defendants' pricing of the CUSIP license similarly demonstrates that they are misusing the ABA's compilation copyright to police and unlawfully profit from the mere use of CUSIP numbers, not the copying of the CUSIP_DB compilation.

90.    S&P calculated (and FactSet now calculates) a CUSIP User's fee based on the number of CUSIP numbers it "database[s]." The sliding scale starts at "under 500 securities" and ends at "greater than 40,000 securities," with six gradations in between. If S&P were pricing a license based on its copyright to the CUSIP_DB compilation, it would calculate the number of times a CUSIP User had copied the compilation, not the number of CUSIP numbers downloaded.

91.    A CUSIP User that is databasing 500 CUSIP numbers is not copying all or substantially all of the CUSIP_DB compilation. In addition, the CUSIP User is not receiving the CUSIP_DB compilation and therefore cannot be infringing the compilation copyright. Instead, it is using 500 CUSIP numbers it received from its Third-Party Data Vendor, and S&P's license is imposing an unjustified usage fee on the CUSIP User. Such a usage fee is not a legitimate use of the ABA's intellectual property rights, but a misuse of the copyright based on the false assertion that the ABA copyright protects CUSIP numbers.

92.    The CUSIP numbers are not copyrightable as a matter of copyright law.

93.    Numbers used for identification such as parts numbers or CUSIP numbers, stand outside copyright protection because they lack the originality and creativity that is a constitutional and statutory requirement for copyright protection. Indeed, extending copyright protection to such

numbers would unduly interfere with the legitimate use of the numbers in question. If such a copyright were allowed, *any* use of the number would potentially infringe the copyright. Moreover, CUSIP numbers lack originality and creativity by design. Each part of the sequence of characters making up a CUSIP is dictated by the long-standing convention of the numbering system, and the utility of CUSIP numbers depends on Defendants slavishly adhering to that system. CUSIP numbers would lose their utility were Defendants to inject any subjectivity, originality, or creativity into them because electronic systems could not then read and process CUSIP numbers to identify the underlying financial instruments.

94.     As stated above, ISINs are the equivalent standard for international financial transactions involving United States financial instruments. The CUSIP number is an element of the ISINs, along with additional digits added by the European numbering agency. Defendants require a license for the use of CUSIP numbers in the ISINs. By contrast to Defendants, none of the administrators of numbering systems in the European Union claim intellectual property rights over those numbering systems, and in the European Union there is no charge for the use of the identifying numbers.

## VIII.   DEFENDANTS THREATEN LITIGATION AND LOSS OF CUSIP NUMBERS IF A FINANCIAL INSTITUTION REFUSES TO SIGN A LICENSE.

95.     Defendants make two threats against unlicensed financial institutions: litigation including seeking injunctive relief stopping the financial institution from using CUSIP numbers and the removal of CUSIP numbers from the data feed the financial institution receives from its Third-Party Data Vendor.

96.     Defendants' process is to send letters to unlicensed financial institutions asserting that CUSIP numbers are copyrighted, and that the financial institution's unlicensed use is infringing or otherwise violative of some "rights" or "property" of Defendants. Those statements

alone are sufficient to put the unlicensed financial institution on notice that it may face litigation over its use of CUSIP numbers, including infringement and injunctive relief litigation. This would trigger the unlicensed financial institution's right to file a declaratory judgment action seeking a ruling that its use does not infringe the copyright.

97.     S&P requires that unlicensed CUSIP Users execute an agreement whose purpose, at least in part, is to inform unlicensed CUSIP Users that any unauthorized use of the CUSIP numbers will subject the CUSIP User to litigation. That agreement is the Subscription Agreement, by which the CUSIP User subscribes to the S&P "service." Section 2 of the Subscription Agreement states that the data the CUSIP User receives is protected intellectual property:

> Subscriber expressly acknowledges that the Data was compiled, prepared, selected, arranged and published by [CGS] under authority from the ABA through the application of methods and standards of judgment developed and applied through the expenditure of substantial time, effort and money, and that the Data constitutes valuable intellectual property of [CGS] and the ABA and that no proprietary rights are being transferred to Subscriber in such materials or in any of the information contained therein.

98.     None of that is true. These statements are relevant to the CUSIP_DB compilation in its entirety, but not to CUSIP numbers, issuer names, and types of issue a CUSIP User obtains from its Third-Party Data Vendor and agrees under pressure to "license." The CUSIP numbers, the issuer names, and the types of issue do not constitute "valuable intellectual property" of any of the Defendants.

99.     Yet, Section 2 of the Subscription Agreement provides that the "Subscriber agrees that misappropriation or misuse *of such materials* will cause serious damage to CGS and ABA; consequently, Subscriber agrees that in the event of any misappropriation or misuse, CGS and the ABA *shall have the right to obtain* injunctive relief" (emphasis added).

100.     Because the CUSIP User is forced to agree that the data it is "licensed" to receive is the protected intellectual property of CGS and the ABA, it is exposed to the argument that any

unlicensed use of CUSIP numbers, issuer names, and types of issue is infringing. Thus, Section 2 informs CUSIP Users that CGS will bring an action for injunctive relief and may obtain an injunction for any unlicensed use of CUSIP numbers—meaning any use not specifically permitted by the license—and that the licensee agrees that the licensor is entitled to an injunction. An injunction would pose an existential threat to the CUSIP User's business.

101.    Moreover, the Subscription Agreement allowed S&P and now allows FactSet to terminate the license agreement entirely if "the Subscriber is violating any of CGS' proprietary rights set out in Section 2." That threat to terminate is itself not limited to an actual, provable breach by the CUSIP User, but rather is exercisable by Defendants even if they have only "reasonable grounds to believe" that the Subscriber is violating any of the alleged proprietary rights claimed by Defendants under Section 2.

102.    Finally, Section 10.1 of the Subscription Agreement provides that in addition to the right to obtain an injunction, CGS is permitted to "pursu[e] any [additional] action or other remedy for any breach or threatened breach of this Agreement, all of which shall be cumulative."

103.    Swiss Life's negotiations with S&P make clear that CUSIP Users have no choice but to accept the Subscription Agreement, despite S&P's many false assertions. After S&P sent Swiss Life a form Subscription Agreement, Swiss Life deleted Section 2. Swiss Life informed Bloomberg that the ISINs were not copyrighted and that Swiss Life would sign an agreement asserting that the data was not copyrighted.

104.    S&P rejected that edit and informed Swiss Life of the language's purpose. On June 27, 2012, Martin Richter of S&P forwarded to Swiss Life his internal email exchange with Richard Dartey, an executive in McGraw Hill's Global Licensing & Contracts department. (McGraw Hill owned S&P Capital IQ at the time). In the June 26, 2012, email, Mr. Dartey asserted that the

language in Section 2 regarding intellectual property gave S&P the right to obtain injunctive relief stopping any unlicensed use of the CUSIP numbers: "The client is failing to acknowledge that CUSIP data is our intellectual property and therefore in the event of misappropriation or misuse we have the right to seek injunctive relief." Mr. Dartey's reference to "CUSIP data" referred to CUSIP numbers, issuer names, and types of issue, which is what S&P proposed Swiss Life "license."

105.    Bloomberg also informed Swiss Life that S&P would not accept the agreement without the copyright clauses and that Bloomberg would have to remove the ISINs from Swiss Life's Bloomberg data feed if Swiss Life did not sign the form agreement. Swiss Life needs ISINs to manage its United States dollar bond portfolio and losing access to the ISINs was an existential threat to its business and thus was not an option. Faced with the threat of litigation and the loss of the CUSIP numbers and, in turn, the ISINs, Swiss Life concluded that it had no reasonable option other than signing the license because the threat of losing access to ISINs was an existential threat to its business. Swiss Life signed the form agreement, which was last renewed in 2019.

106.    Hildene is another example of Defendants' tactics to force CUSIP Users to enter license agreements. Hildene has an agreement with its Third-Party Data Vendor Bloomberg to obtain financial data, a small fraction of which include CUSIP numbers, issuer names, and types of issue. Hildene receives data services from Bloomberg, not from Defendants. Nevertheless, in 2020, S&P demanded that Hildene purchase a license from S&P on the stated premise that Hildene's data feed from Bloomberg contained CUSIP numbers. S&P demanded that Hildene pay an annual fee and threatened to have Bloomberg strip all CUSIP numbers from Hildene's data feed if Hildene refused to sign the license agreement.

107.    When Hildene balked at paying these licensing fees, S&P sent a series of increasingly hostile letters. On March 19, 2021, Alison Romeo, a CGS Product Manager, sent Hildene's John Scannell a letter warning: "[I]f we do not hear from you or if we do not receive a completed CUSIP Use of Service Statement, we will have no choice but to contact all applicable ISPs [information service providers] that may furnish you with CGS Data in bulk, data feed or downloadable format, and enforce our rights to require such ISPs to discontinue furnishing your firm with this CGS Data." In referring to "CGS Data," Ms. Romeo was referring to CUSIP "Identifiers" and descriptions. In fact, CGS's license agreement with Hildene was expressly limited to: "CUSIP License to 2,500 Identifiers." Further, by stating that they would contact "all applicable ISPs" Ms. Romero was indicating that the boycott agreement included all ISPs (Third-Party Data Vendors). Ms. Romeo instructed Hildene to have its counsel contact Jeffrey Mitnick, an Associate General Counsel at S&P.

108.    On June 8, 2021, Mr. Mitnick sent a letter to Hildene threatening: "In the event that a satisfactory solution is not reached by June 25, 2021, we will have no choice but to send final notification to all applicable authorized vendors to cease servicing your firm with CGS Data." The "CGS Data" that Hildene was accessing through Bloomberg was CUSIP numbers, and that is what CGS eventually "licensed" Hildene—*i.e.*, 2,500 CUSIP numbers. And by stating that it would send "final notification to all applicable authorized vendors" Mr. Mitnick was indicating that the boycott agreement included all Third-Party Data Vendors. In plain language, Mr. Mitnick's threat was that S&P would remove the CUSIP numbers from securities data Hildene receives from Bloomberg, rendering that data useless, an existential threat to Hildene's business.

109.    When Hildene still refused, Daphne Shephard, a Director at S&P, informed Hildene on August 31, 2021, that failure to enter a license by September 20, 2021, would cause her "to

refer this matter to our legal department for further action which may include *the removal of all CGS data from all sources* into Hildene Capital" (emphasis added). By "CGS data," Ms. Shephard was referring to the CUSIP numbers, issuer names, and types of issue because that is the only data that Hildene sought to license. The phrase "further action" was not limited to removal of the data and along with the reference to S&P's legal department was a clear threat that S&P would consider all available legal remedies, inclusive of injunctive relief.

110.    Ms. Shepard renewed S&P's threat to pursue "all available remedies" in an email dated September 9, 2021: "If we do not receive the executed agreements by September 30, 2021, our Licensing Compliance and Legal teams will continue the escalation process. At this juncture in the process, if CGS is unable to reach an agreement with Hildene Capital your firm may lose access to CGS data." Ms. Shepard's threat to "continue the escalation process" with her legal team clearly included a threat to pursue litigation.

111.    S&P also used its market power of its other offerings to coerce financial institutions to sign CUSIP licenses. S&P is a credit-rating agency that issues ratings for both government debt and company debt (public and private). As one of the three largest credit-rating agencies in the United States, S&P is a principal source of ratings data for CUSIP Users that trade, manage, or research debt offerings. Upon information and belief, S&P used its market power in ratings data to coerce financial institutions into accepting a CUSIP license by refusing to provide its ratings data to them unless they entered into license agreements with S&P for use of the CUSIP numbers.

## IX.    DEFENDANTS ALSO MANIPULATED THE STANDARD-SETTING PROCESS TO ELIMINATE THE REMOTE CHANCE THAT X9 WOULD ADOPT ANOTHER NUMBERING SYSTEM AS A STANDARD.

112.    X9, which was created and formally owned by ABA, was and is far from an independent standard-setting committee. Although X9 formally separated from the ABA in 2001,

the ABA has exerted and continues to exert substantial control over the ostensibly independent X9 as evidenced by the significant ties and overlap between the ABA, CGS and X9. For example, both the ABA and S&P's (now FactSet's) CGS division are full voting members of X9. The current Managing Director, and Global Head of CGS is Scott Preiss, who previously chaired X9. Tab Stewart, the Senior Vice President, Financial Services Standards at the ABA is (a) Chair of X9's Policies and Procedures; (b) a representative of X9's CUSIP Working Group, which is the working group responsible for reviewing and approving the CUSIP numbering system as a national standard; and (c) a member of CGS's Board of Trustees. Karin Flynn, Chief Financial Officer of the ABA, is a member of the Board of Trustees of CGS. Nine of the twenty-three members of the CUSIP Working Group were from the ABA and S&P's CGS when CUSIP's X9 accreditation was renewed in December 2020.

113.    Bloomberg created and introduced its free alternative Financial Instrument Global Identifier ("FIGI") numbering system in 2010 and repeatedly sought to have it designated as another standard by X9 to no avail until the end of 2021. FIGI was not a viable alternative standard during the years X9 declined to designate it as an alternative standard, and as a new second standard it still is not a viable alternative to CUSIP today because of the required use of CUSIPs in various regulatory filings and the universal use of CUSIPs throughout the United States financial system. Regardless of Bloomberg's chances of FIGIs becoming a meaningful competitor to the long-entrenched CUSIP standard, the ABA and S&P agreed and conspired to use their influence over X9 to help ensure that X9 would not choose FIGIs as an alternative standard.

114.    The ABA and S&P abused the standard-setting process to preclude even the chance, however remote, that X9 would adopt an alternative standard because they were intent on ensuring that Defendants could continue to exploit CUSIP's position as the entrenched standard, with no

competition, to force CUSIP Users to enter "license agreements" under the threat of, among other things, having their access to essential CUSIP numbers cut off.

## X.   IN THE ALTERNATIVE, IF CUSIP NUMBERS ARE FOUND TO BE PROTECTED BY COPYRIGHT, DEFENDANTS ARE VIOLATING THE ABA'S COMMITMENT TO X9 TO LICENSE ON FRAND TERMS.

115.   Assuming *arguendo* that CUSIP numbers were determined to be copyrightable, which they are not, Defendants have violated the commitment made by the ABA, as the claimed holder of the intellectual property ("IP"), to X9 to offer licenses to CUSIP numbers and the CUSIP numbering system on FRAND terms, including price. While Defendants were not and are not entitled to require CUSIP Users to pay any "license" fees for accessing CUSIP numbers, the fees they coerce from CUSIP Users, at a minimum, violated the ABA's FRAND commitment.

116.   X9's procedures require that holders of IP essential to a standard either disclaim their proprietary IP or provide licenses to their IP on FRAND terms (the "Assurance"). The Assurance requirement applies to all IP. According to X9's procedures: "Use of trademarks, copyrighted, or patented materials shall be in accordance with the X-9-approved policies."

117.   The Assurance requirement is consistent with the ANSI Intellectual Property Rights ("IPR") policy, which requires that entities contributing to a standard disclose if they have or may assert proprietary IP rights as to their contribution to the standard and disclose the terms and conditions under which they will license (or refuse to license) to those whose use of the standard would infringe those IP rights without a license.

118.   As required by both X9's procedures and the ANSI IPR policy, during the standard setting process, the ABA disclosed its intended licensing terms and committed that it would license

- 34 -

the CUSIP numbering system on FRAND[9] terms and conditions, including pricing. CUSIP Users as licensees of S&P (now FactSet) are third-party beneficiaries of those commitments.

119.   As an ANSI-Accredited Standards Developer, X9's procedures require each entity that participates in the standard setting process to make an Assurance. As reflected in the CUSIP standard, including both the 2014 and 2020 ANSI X9 CUSIP Standards, the ABA "filed a statement of willingness to grant a license under these rights on reasonable and nondiscriminatory terms and conditions to applicants desiring to obtain such a license." Pursuant to X9's policies, this statement of willingness applies to the use of "trademarks, copyrighted, or patented materials."

120.   CGS's website confirms the ABA's FRAND commitment. The CGS website states:

> CGS seeks to charge fair, reasonable and non-discriminatory license fees for providing the convenience and functionality of direct or indirect access to and benefit of CGS Data . . . . End User customers are asked to complete a Use of Service Statement that allows CGS to determine the appropriate License fees for that end user customer. CGS's Use of Service Statement helps CGS to achieve its objective of ensuring that end user customers are treated in a fair, reasonable and [sic] user customer derives from Usage of CGS Data.[10]

121.   The FRAND commitment and obligation, such as the commitment that was voluntarily undertaken by the ABA, are critical tools in preventing monopoly hold up (or providing recourse if monopolists created through the standard setting process, as here, attempt to engage in "hold up") and ensuring that the standard remains accessible on fair, reasonable, and non-discriminatory terms to all who wish to utilize it. Here, however, the FRAND commitment was an empty promise: X9 was influenced and controlled by the ABA, the party making the FRAND

---

[9] In some standards setting organizations, particularly in the United States, the commitment is or has been phrased as "reasonable and non-discriminatory" or RAND, and in some organizations, particularly outside the United States, it is defined as "fair, reasonable, and non-discriminatory" or FRAND. The more common usage today is "FRAND" which is the term that will be use throughout this Complaint.

[10] See CGS Licensing Policies FAQs, How Are CGS License Fees calculated for End User Customers?, CUSIP GLOBAL SERVICES, https://www.cusip.com/services/license-fees.html (last visited Dec. 21, 2022).

commitment, and its co-conspirator S&P (now FactSet), all of which directly benefitted from Defendants' violation of their FRAND obligations. S&P's (now FactSet's) recognition of their obligation to honor that commitment is reflected in CGS's License Fee Policy, pledging that S&P's (now FactSet's) CGS seeks to charge "fair, reasonable and non-discriminatory license fees."

122.    Defendants, however, breached that commitment by charging Plaintiffs and members of the Class unfair, unreasonable, and arbitrary fees based on false claims of copyright, which Defendants should not have charged because they had no right to prevent Plaintiffs and other Class members from using CUSIP numbers and thus no right to demand "licenses" or "license fees." The incremental cost of electronic distribution of information to any user is zero. Thus, it is not surprising that in areas outside the United States, such as the European Union, providers of identifying numbers for financial instruments do not charge financial institutions for the use of the identifier numbers. Bloomberg created FIGI, an alternative to the CUSIP numbering system, that it sought to make available entirely free of charge to users.

123.    Defendants incur no incremental cost when a CUSIP User "uses" a CUSIP number it has received from its contracted Third-Party Data Vendor rather than from Defendants. Therefore, for the Class members, there is no basis on which Defendants can argue that any charge other than $0.00 is fair or reasonable. Thus, every dollar of licensing fees that S&P extracted and FactSet extracts from Plaintiffs and other members of the Class is supra-competitive and in breach of the FRAND commitment.

124.    S&P (now FactSet), which acts on behalf of the ABA, is bound by the ABA's FRAND commitment, which applies to the licenses CUSIP Users sign. Underscoring its understanding of its requirement to honor that commitment, S&P (now FactSet) represents on its website that it complies with the ABA's licensing commitment as set forth above. A key purpose

of the FRAND commitment is to prevent holders of proprietary rights on technologies that are incorporated into standards from engaging in "hold up," which is the exercise of the market power conferred by the standard to charge users of the standard supra-competitive prices and other anticompetitive licensing terms.

125.     Therefore, in the alternative, if CUSIP numbers are determined to be copyrighted (which they are not), Plaintiffs and members of the Class are entitled to the entirety of their licensing fees as damages.

## XI.     RELEVANT MARKET AND DEFENDANTS' MARKET POWER

126.     The relevant product market is the market for using identifying numbers after initial issuance (defined *supra* as the "CUSIP Use Market"). Because identifiers of financial instruments are national in scope, identifiers used for non-United States financial instruments are not used or useful to identify United States financial instruments. Thus, only the use of identifiers of United States financial instruments are included in the relevant product market.

127.     The relevant geographic market is the United States.

128.     S&P has had a 100% share in the CUSIP Use Market, as does FactSet today. At all relevant times S&P had and FactSet has monopoly power in the CUSIP Use Market.

129.     Alternative numbering systems have been inadequate substitutes for CUSIP numbers because the CUSIP numbering system is and has been the market standard for decades.

130.     The existence of other identifiers or potential identifiers did not and does not constrain S&P's ability to raise or maintain prices of licenses for use of CUSIP numbers without losing substantial sales and did not and does not constrain FactSet's ability to do the same now because Defendants successfully excluded other competitors from replacing CUSIP numbers as the market standard.

131.    S&P has had and FactSet now has both the power to exclude competition in and the power to maintain supra-competitive prices for licenses for the use of CUSIP numbers paid by CUSIP Users without losing substantial sales to potential rivals. S&P's long history (and FactSet's shorter history) of charging supra-competitive prices and excluding competitors demonstrates this monopoly power.

132.    A small but significant, non-transitory price increase in CUSIP licenses would not cause, and has not caused, a significant loss of sales to potential rivals to make such a price increase unprofitable. Indeed, S&P imposed on all three named Plaintiffs price increases of more than $10,000 on CUSIP numbers (including the CUSIP numbers in ISINs) they had been using for free, and yet Plaintiffs did not switch to an alternative numbering system. Thus, the pricing of licenses for the use of CUSIP numbers does not exhibit significant, positive cross-elasticity of demand with respect to prices charged by any other entity.

133.    There are no natural barriers to entry into the CUSIP Use Market. The CGS website acknowledges that collections of CUSIP numbers can be created based on public data. However, Defendants' illegal, exclusionary, and anticompetitive conduct has created substantial unnatural barriers to entry.

## XII.    CLASS ACTION ALLEGATIONS

134.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3), Plaintiffs bring this action for themselves and on behalf of the following classes.

135.    The "CUSIP User Class":

All persons or entities (other than Third-Party Data Vendors) that directly paid a so-called "license fee" to S&P or FactSet pursuant to the Subscription Agreement and the Use of Services Statement at any time beginning March 4, 2018 until the anticompetitive acts end (the "Class Period") and did not license the CUSIP_DB compilation.

136.    The "Injunctive Relief Class" (together with the CUSIP User Class, the "Classes"):

All persons or entities (other than Third-Party Data Vendors) that currently have entered into a Subscription Agreement and are paying a so called "license fee" to FactSet (including to CGS) and did not license the CUSIP_DB compilation.

137.   Plaintiffs also bring this action for themselves and on behalf of the following sub-class (the "New York Unfair Business Practices Sub-Class"):

All persons or entities (other than Third-Party Data Vendors) that directly paid a so-called "license fee" to S&P or FactSet in New York pursuant to a Subscription Agreement and Use of Service Statement at any time beginning March 7, 2019 until the unfair and deceptive business practices end (the "New York Subclass Period") and did not license the CUSIP_DB compilation.

138.   Additionally, Hildene brings this action on behalf of itself and on behalf of the following sub-class (the "Connecticut Unfair Business Practices Sub-Class," and together with the "New York Unfair Business Practices Sub-Class," the "Sub-Classes"):

All persons or entities (other than Third-Party Data Vendors) that reside in Connecticut that directly paid a so-called "license fee" to S&P or FactSet pursuant to a Subscription Agreement and Use of Service Statement at any time beginning March 7, 2019 until the unfair and deceptive business practices end (the "Connecticut Sub-Class Period") and did not license the CUSIP_DB compilation.

139.   Excluded from the Classes and Sub-Classes are governmental entities, Defendants, any parent, subsidiary, or affiliate thereof, Defendants' officers, directors, employees, and immediate families thereof, any legal representative, heir, or assign of any Defendant, and any person acting on their behalf, any judicial officer presiding over or assigned to hear any aspect of this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

140.   Plaintiffs and the Classes and Sub-Classes are seeking damages and an injunction for Defendants' violations alleged herein.

141.   The Classes and Sub-Classes are readily ascertainable, and the members of the Class and Sub-Classes are readily identifiable from information and records maintained by S&P and FactSet.

142.    Members of the Classes and Sub-Classes are so numerous that joinder of all members is impracticable.  The members of the Classes and Sub-Classes are numerous and widely dispersed throughout the United States and around the world.

143.    Plaintiffs' claims are typical of the claims of the members of the Classes and Sub-Classes. Within the Classes and Sub-Classes, Plaintiffs' interests are not antagonistic to the claims of the other members of the Classes and Sub-Classes, and there are no material conflicts with any other members of the Classes and Sub-Classes that would make class certification inappropriate. Plaintiffs and all members of the Classes and Sub-Classes were damaged by the same wrongful conduct of Defendants.

144.    Plaintiffs will fairly and adequately protect and represent the interests of the members of the Classes and Sub-Classes. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the members of the Classes and Sub-Classes.

145.    Plaintiffs are represented by counsel (Competition Law Partners PLLC, Kaplan Fox & Kilsheimer LLP, and Wollmuth Maher & Deutsch LLP) who are experienced and competent in the legal issues involved in this Complaint and in the prosecution of class action litigation, and who have particular experience with class action litigation involving alleged violations of antitrust law in the financial services industry.

146.    Questions of law and fact common to the members of the Classes and Sub-Classes predominate over questions that may affect only individual Class and Sub-Class members because Defendants have acted on grounds generally applicable to the entirety of the Classes and Sub-Classes, thereby determining damages with respect to the Classes and Sub-Classes as a whole is appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

147.    There are legal and factual questions common to the Classes and Sub-Classes, which do not vary from Class member to Class member and which may be determined without reference to individual circumstances of any Class or Sub-Class member. These include, but are not limited to, the following:

(a)    Whether CUSIP numbers are copyrighted or copyrightable;

(b)    Whether S&P (and now FactSet) has monopoly power in the CUSIP Use Market;

(c)    Whether S&P (and now FactSet) willfully maintained and enhanced its monopoly power in the CUSIP Use Market;

(d)    Whether the standardized contractual restriction on Third-Party Data Vendors have constituted an unreasonable restraint of trade;

(e)    Whether S&P and the ABA (and now FactSet and the ABA) conspired for S&P (and now FactSet) to willfully acquire, maintain or enhance its monopoly power in the CUSIP Use Market;

(f)    Whether S&P and the ABA (and now FactSet and the ABA) conspired to monopolize the relevant market by engaging in unlawful exclusionary conduct to acquire, maintain or enhance S&P's (and now FactSet's) monopoly power in the CUSIP Use Market;

(g)    Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and other members of the Classes and Sub-Classes;

(h)    What is the appropriate measure of damages;

(i)    Whether the conspiracies alleged herein violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

(j)    Whether the alleged monopolization and conspiracy to monopolize violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

(k)    Whether, if the CUSIP numbers were found to be protected by copyright (which they are not), Defendants violated ABA's FRAND agreement in charging Plaintiffs and members of the Class non-FRAND prices for CUSIP "licenses;"

(l)    Whether Defendants' conduct was unfair and had the capacity to and did materially deceive or threaten Plaintiffs and similarly situated members of the New York Unfair Business Practices Sub-Class when transacting business in the State of New York;

(m)     Whether Defendants' conduct was unfair and had the capacity to and did materially deceive or misled Plaintiffs and similarly situated members of the Connecticut Unfair Business Practices Sub-Class members when transacting business in the State of Connecticut; and

(n)     Whether the Classes and Sub-Classes are entitled to the injunctive relief sought.

148.    Class action treatment is a superior method to other available methods for the fair and efficient adjudication of the controversy.  The prosecution of separate actions by individual members of the Classes and Sub-Classes would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes and Sub-Classes.  Class action treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in management of this class action.

149.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## XIII.   THE ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

150.    Defendants' conduct has produced and continues to produce substantial anticompetitive harm. Their agreements—both the Subscription Agreement with CUSIP users and their agreements with Third-Party Data Vendors—exclude competition in, and competitors from, the CUSIP Use Market and deny CUSIP Users the benefits of robust competition, including the

benefit of innovation that results from and creates robust competition. Defendants' success in stopping actual and potential competitors—such as the Third-Party Data Vendors and other data and fintech companies such as Xignite—from the unlicensed use of CUSIP numbers has prevented potential competitors from using the CUSIP numbers to develop value-added services that would benefit CUSIP Users and would compete with Defendants.

151.    Defendants' anticompetitive conduct imposes unnecessary burdens on financial markets, thereby reducing competition, liquidity, and transactional flow. Competitors and other market participants have repeatedly complained about the harmful effects of Defendants' anticompetitive conduct. For example, Bloomberg, a potential competitor in the CUSIP Use Market (but for the restrictive Third-Party Data Vendor agreements and resulting group boycott) and who even created FIGI as an alternative to CUSIP in an unsuccessful attempt to break S&P's (and now FactSet's) control of the market, wrote to the SEC in October 2017 to voice its concern over the anticompetitive effects of Defendants' conduct: "The process of obtaining a CUSIP, and the restrictive licensing imposed on its use imposes unnecessary burdens on firms by interrupting transactional flow and timing. This is evidenced by the assertion that competition would be reduced, liquidity would be negatively affected, and parties would actively seek ways to avoid processes that would require use of a CUSIP." Bloomberg added that by forcing market participants to pay arbitrary fees to use CUSIP numbers, S&P "imposes a significant and restrictive cost on the industry as a whole," which negatively affects liquidity and reduces competition. Bloomberg also expressed concern that restricting the use of CUSIP numbers would disadvantage "new technology and can instead stifle innovation."[11]

---

[11] *See* Letter from Peter Warms, Senior Manager, Bloomberg, to Brent Fields, Secretary, SEC (Oct. 10, 2017), https://www.sec.gov/comments/sr-msrb-2017-06/msrb201706-2631530-161220.pdf.

152.    Defendants' restrictive licensing practices impede actual and potential competitors from innovating in the financial markets including by raising the costs of potential rivals. Notwithstanding the tremendous advancements in technology over the past decades, Defendants still are charging CUSIP Users unlawful licensing fees whereas there are no charges for the use of financial instrument identifiers in almost every (if not every) market outside the United States for non-United States financial instruments. Moreover, Defendants continue to impose and collect these fees with no lawful justification for requiring a license and with no substantial improvements to the product they are licensing.

153.    Defendants' contracts, which allow S&P (and now FactSet) to audit licensees' use of CUSIP numbers, are anticompetitive and create anticompetitive harm. The audit function allows S&P (and now FactSet) to disintermediate the relationships between the Third-Party Data Vendors and their customers by interfering in that relationship and potentially replacing the Third-Party Data Vendors. The audit function also gives S&P (now FactSet) the opportunity to not only understand, but also to track the status and progress of the businesses of its potential rivals who are collecting CUSIP numbers and compiling their own datasets or otherwise combining CUSIP numbers into their own innovative services. This anticompetitive insight also allows Defendants to market and sell more effectively against these emerging rivals based on access to those rivals' proprietary and competitively sensitive information.

154.    By imposing unnecessary costs on the use of CUSIP numbers, Defendants' conduct reduces transparency in financial markets and thereby creates inefficiencies that impede actual and potential rivals from creating more efficient and attractive data offerings that use CUSIP numbers. The municipal bond market provides an example of this anticompetitive effect. Marc Joffe, a Senior Policy Analyst at the Reason Foundation, has written that Defendants' restrictive licensing

policies reduce transparency in municipal bond markets.[12] The Municipal Securities Rulemaking Board ("MSRB") maintains a public information site for municipal bonds known as Electronic Municipal Market Access ("EMMA"). EMMA theoretically should permit data companies that could compete with Defendants to process information about municipalities' debt practices quickly and efficiently.

155.    Yet Defendants require that the MSRB post the following notice on the EMMA site:

> You agree that you will not use the CUSIP Numbers and Securities Descriptions contained on the Website for any other purpose. You may not download CUSIP Numbers and Securities Descriptions from the Website. Such information obtained from the Website shall not be re-disseminated other than as provided in these Terms and, to the extent such information is re-disseminated by you to other parties, you will take all necessary and reasonable precautions to ensure that recipients who obtain the information directly or indirectly from you do not use CUSIP Numbers or Securities Descriptions for any other purpose.[13]

156.    Mr. Joffe notes the MSRB implements these restrictions by displaying the CUSIP numbers as images (similar to Defendants' requirement that Third-Party Data Vendors not provide CUSIP numbers in data feed or downloadable format to unlicensed CUSIP Users), thus "rendering them impossible to copy and paste into spreadsheets." This makes the task of "[c]ompiling lists of all the outstanding bonds issued by any large government entity…tedious and time-consuming." This raises the costs of processing and analyzing the data on the EMMA site for any data company wishing to compete with Defendants. The result is reduced transparency into municipal debt practices, which "undermin[es] government financial transparency" to the detriment of taxpayers.

---

[12] Marc Joffe, *Class action lawsuits against CUSIP could improve government transparency*, REASON FOUNDATION, (Mar. 18, 2022), https://reason.org/commentary/class-action-lawsuits-against-cusip-could-improve-government-transparency/.

[13] *Municipal Securities Rulemaking Board's Website Terms of Use*, MSRB (Apr. 29, 2022), https://www.msrb.org/form/disclaimer.

157.    No legitimate pro-competitive efficiencies or other pro-competitive arguments justify Defendants' conduct in misusing their copyright, and in abusing S&P's and now FactSet's monopoly power to continue willfully and unreasonably restraining trade to extort fees from CUSIP Users.

158.    Absent Defendants' anticompetitive conduct, Plaintiffs and members of the Classes and Sub-Classes would not have had to enter into license agreements and pay Defendants substantial amounts of annual fees and would be free to compete with Defendants and innovate in the use of CUSIPs without fear of threatened litigation and the imposition of injunctions that would threaten the viability of their businesses.

159.    S&P (and now FactSet) have extracted from CUSIP Users, on information and belief, at least an estimated $100 million each year in unlawful charges that they would not have obtained absent Defendants' unlawful course of conduct.

160.    Defendants' unlawful conduct harmed and continues to harm competition by stifling innovation and competition in the CUSIP Use Market, thereby depriving CUSIP Users of the benefits of greater variety and increased competitive choices at lower prices that would exist in a competitive market, and by diverting financial resources to the Defendants that would otherwise be used by actual and potential rivals, including Third-Party Data Vendors and CUSIP Users. These anticompetitive effects ultimately result in higher costs and lower returns to CUSIP Users, and therefore to the retirees and future retirees whose pension funds, retirement funds, 401(k)s, and IRAs are the customers and clients of the financial institutions that are the CUSIP Users.

161.    There is no cognizable or plausible procompetitive justification for Defendants' unlawful conduct, or one that outweighs its anticompetitive effects. The only purpose for

Defendants' conduct is to prevent competition and generate millions of dollars in revenue a year from CUSIP Users' use of already issued CUSIP numbers.

162.    CUSIP Users, including Plaintiffs, will continue to suffer such injury unless the relief sought in this Complaint is granted.

## XIV.   CLAIMS FOR RELIEF

### First Claim for Relief

**(Declaratory Judgment Under the Declaratory Judgment Act, 28 U.S.C. § 2201 and the United States Copyright Act of 1976, 17 U.S.C. § 101 *et seq*.)**

**(On Behalf of the CUSIP User Class Against All Defendants)**

163.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

164.    During the relevant period, Defendants have asserted (and continue to assert) that CUSIP numbers are copyrighted. The CUSIP numbers are not copyrighted or entitled to copyright under the Copyright Act of 1976, 17 U.S.C. §101 *et seq*.

165.    There is an actual case and controversy created by threats of litigation and of the imposition of injunctions concerning whether Defendants have a valid claim of copyright to CUSIP numbers. A judicial determination of the parties' rights and duties is necessary and appropriate at this time and under these circumstances to resolve the controversy between the parties and afford relief from the dispute over the copyrightability of CUSIP numbers giving rise to this proceeding.

166.    Declaratory judgment is appropriate under the Declaratory Judgment Act, 28 U.S.C. § 2201 to declare the rights of Plaintiffs by declaring that Defendants had (and have) no valid claim of copyright in and to the CUSIP numbers.

167.    Because 28 U.S.C. § 2202 empowers this Court to grant, "necessary or proper relief based on a declaratory judgment or decree . . . after reasonable notice and hearing, against any

adverse party whose rights have been determined by such judgment," Plaintiffs are entitled to a declaration that the CUSIP numbers are not copyrighted and are not copyrightable.

## Second Claim for Relief

**(Monopolization in Violation of Section 2 of the Sherman Act, Unlawful Maintenance of Monopoly Power)**

**(On Behalf of the CUSIP User Class Against S&P and FactSet)**

168.    Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint.

169.    During the relevant period, S&P and now FactSet has had a monopoly in and each has willfully and unlawfully maintained its monopoly in the United States CUSIP Use Market by engaging in a course of exclusionary conduct that discouraged rather than encouraged and prevented competition or potential competition in the United States CUSIP Use Market.

170.    The goal, purpose, and effect of S&P's and now FactSet's conduct, was and is to maintain and extend S&P's and FactSet's monopoly power. Defendants' illegal conduct enabled S&P (and now FactSet) to obligate CUSIP Users, including Plaintiffs, to execute the Subscription Agreement and CUSIP Use of Service Supplement (the "Unlawful Agreements").

171.    The course of conduct constitutes unlawful monopolization of the CUSIP Use Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

172.    There is no procompetitive justification for S&P's and now FactSet's unlawful conduct in willfully maintaining its monopoly in the CUSIP Use Market. Even if, contrary to fact, there were assumed to be a procompetitive justification, the exclusionary conduct was not necessary to achieve any such procompetitive purpose, which could have been realized by less restrictive alternatives and the anticompetitive effects of S&P's and now FactSet's conduct have far outweighed the procompetitive benefits.

173.    As a direct, material, and proximate result of S&P's and now FactSet's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, Plaintiffs and members of the Class have been injured by being deprived of the benefits of a competitive market for the use of CUSIP numbers and have suffered damages in an amount to be proved at trial and without injunctive relief.

174.    Plaintiffs and members of the Class will continue to suffer injury as a result of S&P's and now FactSet's ongoing unlawful conduct.

## **Third Claim for Relief**

### **(Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act)**

### **(On Behalf of the CUSIP User Class Against All Defendants)**

175.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

176.    During the relevant period, Defendants have engaged in a conspiracy to monopolize the CUSIP Use Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, *et seq.*

177.    During the relevant period, Defendants have conspired to willfully and unlawfully maintain S&P's (now FactSet's) monopoly power in the United States CUSIP Use Market by engaging in exclusionary conduct that discouraged rather than encouraged competition on the merits. As explained in detail above, Defendants conspired to exclude other potential competitors from entry into the CUSIP Use Market.

178.    The goal, purpose, and effect of Defendants' conspiracy was and is to maintain and extend S&P's and now FactSet's monopoly power.

179.    Defendants' conspiracy to monopolize the CUSIP Use Market had a dangerous probability of success as demonstrated by its success in excluding any meaningful competition in that market and preserving S&P's and now FactSet's monopoly.

180.    There is no procompetitive justification for Defendants' unlawful conduct in conspiring to maintain S&P's and now FactSet's monopoly over the CUSIP Use Market and charging unlawful licensing fees to CUSIP Users with no connection to the value, if any, of the services provided. Even if, contrary to fact, there were assumed to be a procompetitive justification, the exclusionary conduct was not necessary to achieve the procompetitive purpose, any such procompetitive purpose could have been obtained by less restrictive alternatives, and the anticompetitive effects of Defendants' conduct far outweigh the procompetitive benefits.

181.    As a direct, material, and proximate result of Defendants' violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, Plaintiffs and members of the Class have been injured and suffered damages in an amount to be proved at trial.

182.    Without injunctive relief, Plaintiffs and members of the Class will continue to suffer injury as a result of Defendants' ongoing unlawful conduct.

**Fourth Claim for Relief**

**(Group Boycott in Violation of Section 1 of the Sherman Act)**

**(On Behalf of the CUSIP User Class Against All Defendants)**

183.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

184.    S&P, the ABA, FactSet, and the Third-Party Data Vendors agreed to refuse to deal with CUSIP Users, including Plaintiffs, unless CUSIP Users signed a license agreement with S&P, and now FactSet, for CUSIP numbers, issuer names, and types of issue.

185.    This group boycott violates of Section 1 of the Sherman Act, 15 U.S.C. § 1.

186.    The purpose and effect of this group boycott was to restrain competition in the CUSIP Use Market.

187.    There is no procompetitive justification for S&P's (and now FactSet's) unlawful agreement with the Third-Party Data Vendors. Even if, contrary to fact, there were assumed to be a procompetitive justification, the unlawful conduct was not necessary to achieve any such procompetitive purpose, which could have been realized by less restrictive alternatives, and the anticompetitive effects of S&P's (and now FactSet's) unlawful agreement with the Third-Party Data Vendors have far outweighed the procompetitive benefits.

188.    CUSIP Users, including Plaintiffs, were harmed and are being harmed by S&P's, the ABA's, and FactSet's conduct because they were deprived and are being deprived of a competitive market in which to obtain CUSIP numbers for use after their initial issuance, and as a result had to pay license fees that were and are unwarranted and unlawful.

189.    Defendants' conduct was and is a substantial factor in causing Plaintiffs' harm.

## Fifth Claim for Relief in the Alternative

### (Breach of Contract)

### (On Behalf of the CUSIP User Class Against All Defendants)

190.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein. This Claim is relevant if and only if CUSIP numbers were found to be protected by copyright.

191.    During the standard selection and approval process, the ABA filed a statement of willingness and entered a binding commitment to X9 that it would offer access to the CUSIP numbering system on FRAND terms. That commitment obligated S&P (and now FactSet) to offer access to the CUSIP database, including the CUSIP numbers, on FRAND terms, as CGS acknowledges on its website.

192.    Plaintiffs and other CUSIP Users were and are intended third-party beneficiaries of the ABA's FRAND commitment, which is a contract between X9 and the ABA.

193.    S&P (and now FactSet), acting on behalf of ABA, were bound by the ABA's FRAND commitment. CGS's License Fee Policy recognizes S&P's (and now FactSet's) FRAND obligation by pledging that it seeks to charge "fair, reasonable and non-discriminatory license fees."

194.    Having chosen to require the CUSIP Users to sign the Unlawful Agreements, the ABA, and S&P (and now FactSet) acting on its behalf, was required by its FRAND commitment to X9 to offer those licenses on FRAND terms.

195.    Defendants, however, breached that commitment by charging Plaintiffs and members of the Class unfair, unreasonable, and arbitrary license fees.

196.    The incremental cost of electronic distribution of existing information including CUSIP numbers to any user is zero. Defendants incur no incremental cost when a CUSIP User "uses" a CUSIP number it has received from their contracted Data Vendor rather than from Defendants.

197.    Therefore, any charge other than $0.00 for the use of issued CUSIP numbers is not a FRAND price, and every dollar of licensing fees that Defendants extracted from Plaintiffs and other members of the Class is in breach of the FRAND commitment.

### Sixth Claim for Relief

**(Violations of New York General Business Law § 349(a))**

**(On Behalf of the New York Unfair Business Practices Sub-Class Against All Defendants)**

198.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs.

199.     At all times relevant herein, the New York General Business Law ("GBL") was in effect. GBL § 349(a) makes unlawful the use of purposeful and threatening, unfair, deceptive, or misleading acts or practices in the conduct of any business in the State of New York that cause injury to consumers and business entities, including Plaintiffs and members of the New York Unfair Business Practices Sub-Class.

200.     Defendants were and are doing business in the State of New York and thus are subject to New York law for their acts, practices, and conduct described in this action. S&P's (now FactSet's) CGS operated out of New York during the relevant period, the threatening, unfair, deceptive and misleading conduct by Defendants emanated from New York and Defendants received payment from the "license agreements" in New York.

201.     Defendants' actions complained of herein were and are consumer-orientated and are threatening, unfair, deceptive and misleading acts and practices in the conduct of Defendants' business that have the capacity to and did mislead and deceive Plaintiffs, and members of the New York Unfair Business Practices Sub-Class.

202.     Defendants have engaged in (a) purposeful, deceitful, unfair and misleading monopolistic conduct to ensure control over the CUSIP Use Market; (b) purposeful, deceitful, unfair, and misleading practices by falsely claiming "license agreements" were necessary to use CUSIP numbers; and (c) threats that CUSIP Users will be unable to access essential data from Third-Party Data Vendors and be subject to copyright infringement claims absent entering "license agreements."

203.     As a result of Defendants' materially threatening, unfair, deceptive, and/or misleading conduct and practices, Plaintiffs and members of the New York Unfair Business Practices Sub-Class have been injured and have incurred damages by Defendants' unlawful acts.

204.    The foregoing acts and practices directly, foreseeably, and proximately caused Plaintiffs and members of the Sub-Class to suffer an ascertainable loss in the form of payment of unlawful and unfair licensing fees to access CUSIP numbers, and Plaintiffs and members of the New York Unfair Business Practices Sub-Class are entitled to recover such damages, together with appropriate penalties, including punitive damages, attorneys' fees and costs of suit.

## Seventh Claim for Relief

### (Violations of Connecticut Unfair Trade Practices Act § 42-110b(a))

### (On Behalf of the Connecticut Unfair Business Practices Sub-Class Against All Defendants)

205.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs.

206.    At all times relevant herein, the Connecticut Unfair Trade Practices Act ("CUTPA") was in effect. CUTPA § 42-110b(a) states that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" in Connecticut that cause injury to people or entities doing business or that reside in the State, including Hildene and members of the Connecticut Unfair Business Practices Sub-Class.

207.    Defendants were and are doing business in the State of Connecticut and thus are subject to Connecticut law for their acts, practices, and conduct described in this action.

208.    Defendants' actions complained of herein were and are threatening, unfair, deceptive, and misleading acts and practices in the conduct of Defendants' business that have the capacity to and did mislead and deceive Hildene, and members of the Connecticut Unfair Business Practices Sub-Class of similarly harmed parties that were injured while residing in Connecticut.

209.    Defendants have engaged in (a) purposeful, deceitful, unfair, and misleading monopolistic conduct to ensure control over the CUSIP Use Market; (b) purposeful, deceitful, unfair, and misleading practices by falsely claiming "license agreements" were necessary to use

CUSIP numbers; and (c) threats that CUSIP Users will be unable to access essential data from Third-Party Data Vendors and be subject to copyright infringement claims absent entering "license agreements."

210.    As a result of Defendants' unfair methods of competition and threatening, unfair, deceptive, and/or misleading business practices occurring within the State, Plaintiff Hildene and other members of the Connecticut Unfair Business Practices Sub-Class have suffered ascertainable losses within the meaning of CUTPA § 42-110g(a) and have been damaged by Defendants' unlawful acts.

211.    The foregoing acts and practices directly, foreseeably, and proximately caused Plaintiff Hildene and other members of the Connecticut Unfair Business Practices Sub-Class to suffer an ascertainable loss in the form of payment of unlawful and unfair licensing fees to access CUSIP numbers, and Plaintiff Hildene and other members of the Connecticut Unfair Business Practices Sub-Class are entitled to recover such damages, together with appropriate penalties, including punitive damages, attorneys' fees and costs of suit.

### Eighth Claim for Relief

### (Injunctive Relief)

### (On Behalf of the Injunctive Relief Class Against FactSet and the ABA)

212.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

213.    This is a claim for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. Plaintiffs and Injunctive Relief Class members seek injunctive relief under 15 U.S.C. § 26 to correct the anticompetitive effect caused by Defendants' unlawful conduct. As stated above, Defendants are in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

214.    Defendants' unlawful conduct threatens to continue to injure Plaintiffs and members of the Injunctive Relief Class. Plaintiffs seek a permanent injunction prohibiting Defendants from continuing their illegal conspiracy to force CUSIP Users to enter the Unlawful Agreements and charge license fees and ordering them to take appropriate remedial action to correct and eliminate any remaining effects of the conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

a.    An order declaring that CUSIP numbers are not copyrighted or copyrightable and that Defendants had (and have) no valid claim of copyright in and to the CUSIP numbers;

b.    An injunction prohibiting Defendants from claiming that CUSIP numbers are copyrighted or copyrightable;

c.    An order declaring that the CUSIP Global Services Subscription Agreement and CUSIP Use of Service Statement are unenforceable;

d.    An injunction prohibiting enforcement of the CUSIP Global Services Subscription Agreement and CUSIP Use of Service Statement;

e.    An order declaring that Defendants may not impose fees on CUSIP Users, including Plaintiffs, that obtain their data from a Data Vendor and may not alter their agreements to require Plaintiffs to obtain their data from Defendants;

f.    An injunction prohibiting the imposition of fees by Defendants on CUSIP Users, including Plaintiffs, for the use of CUSIP numbers after their initial issuance;

g.    An order declaring that Defendants have engaged in anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act;

h.      An order declaring that this action may proceed as a class action on behalf of the Classes and Sub-Classes;

i.      An injunction permanently enjoining and restraining Defendants from continuing and maintaining S&P's (now FactSet's) abuse of monopoly power alleged in the Complaint under Section 16 of the Clayton Act, 15 U.S.C. § 26;

j.      A judgment awarding actual damages trebled (*i.e.*, three times the amount of the so-called "license fees") for CUSIP Users, including Plaintiffs, in an amount to be determined at trial;

k.      A judgment awarding attorneys' fees and costs of suit;

l.      An order declaring that Defendants' conduct violates Section 349(a) of the New York General Business Law;

m.      A judgment awarding Plaintiffs and members of the New York Unfair Business Practices Sub-Class damages against Defendants for their violations of New York General Business Law Section 349(a), together with appropriate penalties, including punitive damages, attorneys' fees, and costs of suit;

n.      An order declaring that Defendants' conduct violated Section 42-110b(a) of the Connecticut Unfair Trade Practices Act;

o.      A judgment awarding Hildene and the Connecticut Unfair Business Practices Sub-Class damages against Defendants for their violations of the Connecticut Unfair Trade Practices Act Section 42-110b(a), together with appropriate penalties, including punitive damages, attorneys' fees, and costs of suit;

p.      Solely in the event that the CUSIP numbers are held to be protected by copyright, an order that Defendants' license fees are not FRAND and setting the FRAND rate for CUSIP numbers if after a hearing the current rates are determined to not be FRAND;

q.      A judgment awarding Plaintiffs and the CUSIP User Class damages for breaches of contract;

r.      A judgment awarding all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity; and

s.      An order or judgment awarding such other further relief as allowed by law.


## JURY DEMAND

Plaintiffs request a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: December 21, 2022                    Respectfully submitted,

/s/ *Ronald J. Aranoff*_____          /s/ *Leiv Blad*_____
David H. Wollmuth                        Leiv Blad
R. Scott Thompson                        Jeffrey Blumenfeld *pro hac vice*
Ronald J. Aranoff                        Meg Slachetka
Ryan A. Kane                             COMPETITION LAW PARTNERS PLLC
Grant J. Bercari                         1101 Pennsylvania Avenue NW
Katherine E. McQuillen                   Washington, DC  20004
WOLLMUTH MAHER & DEUTSCH LLP             Telephone: (202) 742-4300
500 Fifth Avenue, 12th Floor             Email: leiv@competitionlawpartners.com
New York, New York 10110                 jeff@competitionlawpartners.com
Telephone: (212) 382-3300                meg@competitionlawpartners.com
dwollmuth@wmd-law.com
sthompson@wmd-law.com                    /s/_*Robert N. Kaplan*_____
raranoff@wmd-law.com                     Robert N. Kaplan
rkane@wmd-law.com                        Gregory K. Arenson
gbercari@wmd-law.com                     Elana Katcher
kmcquillen@wmd-law.com                   KAPLAN FOX & KILSHEIMER LLP
                                         850 Third Ave., 14th Floor
                                         New York, NY 10022
                                         Telephone: (212) 687-1980
                                         Email: rkaplan@kaplanfox.com
                                         garenson@kaplanfox.com
                                         ekatcher@kaplanfox.com